## UNITED STATES DISTRICT COURT FOR
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LH DINING L.L.C., doing business as RIVER TWICE RESTAURANT**<br><br>                              **Plaintiff,**<br><br>**vs.**<br><br>**ADMIRAL INDEMNITY COMPANY**<br><br>                              **Defendant.** | **JURY TRIAL DEMANDED**<br><br>**No. 2:20-CV-01869-TJS** |

## PLAINTIFF'S OPPOSITION TO DEFENDANT ADMIRAL INDEMNITY COMPANY'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

### ORAL ARGUMENT REQUESTED

| | |
|---|---|
| Richard M. Golomb, Esq.<br>Kenneth J. Grunfeld, Esq.<br>**GOLOMB & HONIK, P.C.**<br>1835 Market Street, Suite 2900<br>Philadelphia, PA 19103<br>Telephone: (215) 985-9177<br>Facsimile: (215) 985-4169<br>rgolomb@golombhonik.com<br>kgrunfeld@golombhonik.com | Arnold Levin, Esq.<br>Laurence Berman, Esq.<br>Frederick Longer, Esq.<br>Daniel Levin, Esq.<br>**LEVIN SEDRAN & BERMAN LLP**<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106-3697<br>Telephone: (215) 592-1500<br>Facsimile: (215) 592-4663<br>alevin@lfsblaw.com<br>flonger@lfsblaw.com<br>dlevin@lfsblaw.com |
| W. Daniel "Dee" Miles, III<br>Rachel N. Boyd<br>Paul W. Evans<br>**BEASLEY,    ALLEN,    CROW, METHVIN, PORTIS & MILES, P.C.**<br>P.O. Box 4160<br>Montgomery, AL 36103<br>Telephone: (334) 269-2343<br>Facsimile: (334) 954-7555<br>dee.miles@beasleyallen.com<br>rachel.boyd@beasleyallen.com<br>paul.evans@beasleyallen.com | Dated: July 27, 2020<br><br><br>*Counsel for Plaintiff* |

**TABLE OF CONTENTS**

I.  INTRODUCTION....................................................................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND ...........................................3

   A.  COVID-19 Hits the United States and Pennsylvania..........................3

   B.  Impact on River Twice Restaurant .....................................................4

   C.  Admiral Indemnity Company Insurance Policy and its Current
       Dispute with Plaintiff.........................................................................5

III.  APPLICABLE LEGAL STANDARDS ...............................................................7

   A.  Standard for Motion to Dismiss in an Insurance Contract Case .....................7

   B.  Defendant's Motion is Crafted in the Nature of a Motion for Summary
       Judgment Even if Styled as a Motion to Dismiss, But the Standard to
       Apply to a Motion to Dismiss is Much Different and Favorable to a
       Plaintiff Who Has Not Yet Had an Opportunity to Take Discovery and
       Develop the Case Facts .......................................................................9

IV.  ARGUMENT .....................................................................................................12

   A.  The Court Should Not Enforce Defendant's Virus Exclusion .........................12

       1.  Plaintiff's Contract Is Inherently Adhesive and Controlling
           Pennsylvania Law Dictates it Must be Analyzed with Careful
           Scrutiny ...............................................................................12

       2.  The Virus Exclusion in Plaintiff's policy is Ambiguous and Does
           Not Apply...............................................................................13

       3.  Dismissing Plaintiff's Case Based Upon the Virus Exclusion at
           this Stage Would be Premature ..............................................16

       4.  Plaintiff's Regulatory Estoppel Theory Provides an Adequate
           Basis for Further Investigation ..............................................17

   B.  The Civil Authority Orders were Issued as a Result of Damage to
       Property ...........................................................................................19

       1.  The Civil Authority Orders Prohibit Access to Plaintiff's
           Premises ...............................................................................24

   C.  Plaintiff has Suffered Physical Loss of or Damage to its Property and
       Nearby Property...............................................................................26

i

         1.       **Defendants two Lead Cases are Inapposite to this Litigation**..............35

    **D.**     **Plaintiff's Claim for Business Income Coverage is Sufficiently Pleaded**........36

**V.**    **CONCLUSION** ...........................................................................................37

## TABLE OF AUTHORITIES

**Federal Cases**

*Abner, Herrman & Brock, Inc. v. Great Northern Ins. Co.*,
   308 F. Supp. 2d 331 (S.D.N.Y. 2004).................................................................. 25

*Am. Guarantee & Liab.. Ins. Co. v. Ingram Micro, Inc.*,
   No. 99-185 TUC ACM, 2000 WL 726789 (D. Ariz. April 18, 2000)...................................... 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................... 7

*Atl. Deli & Grocery v. United States*,
   2011 WL 2038758 (D.N.J. May 23, 2011) ........................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................. 7, 8, 36

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011).......................................................................... 7

*Celebre v. Windsor-Mount Joy Mut. Ins. Co.*,
   No. CIV. A. 93-5212, 1994 WL 13840 (E.D. Pa. Jan. 14, 1994) .......................................... 12

*Chafin v. Chafin*,
   133 S. Ct. 1017 (2013).............................................................................. 37

*Colony Ins. Co. v. Zena Assocs., LLC*,
   2012 WL 12897100 (E.D. Pa. Dec. 17, 2012) ......................................................... 8

*Colorcon, Inc. v. Lewis*,
   792 F. Supp. 2d 786 (E.D. Pa. 2011) ................................................................ 9

*Commstop v. Travelers Indem. Co. of Connecticut*,
   No. 11-1257, 2012 WL 1883461 (W.D. La. May 17, 2012) ................................................ 25

*Conley v. Gibson*,
   355 U.S. 41 (1957)................................................................................... 7

*Davis v. Wells Fargo*,
   824 F.3d 333 (3d Cir. 2016)....................................................................... 7, 18

*Dickie Brennan & Co., Inc. v. Lexington Ins. Co.*,
   636 F.3d 683 (5th Cir. 2011) ....................................................................... 22

*Dowling v. City of Phila.*,
   855 F.2d 136 (3d Cir.1988)........................................................................ 10

*Essex v. BloomSouth Flooring Corp.*,
   562 F.3d 399 (1st Cir. 2009)...................................................................... 28

*Foglia v. Renal Ventures Mgmt., LLC*,
   754 F.3d 153 (3d Cir. 2014).......................................................................... 7

*Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*,
   119 F. Supp. 2d 552 (E.D.N.C. 2000)........................................................ 28

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009)........................................................................ 7

*Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*,
   193 F.3d 742 (3d Cir. 1999)........................................................................ 8

*General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*,
   887 F.2d 228 (9th Cir. 1989) ...................................................................... 8

*Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*,
   No. 90-35654, 1992 WL 16749 (9th Cir. Jan. 31, 1992)......................... 31

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*,
   No. 2:12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014)............. 28

*Hussey Copper, Ltd. v. Arrowood Indem. Co.*,
   391 F. App'x 207 (3d Cir. 2010)................................................................ 17

*Hussey Copper, Ltd. v. Royal Ins. Co. of Am.*,
   567 F. Supp. 2d 774 (W.D. Pa. 2008)................................................. 17, 18

*Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP v. Chubb Corp.*,
   No. 09-6057, 2010 WL 4026375 (E.D. La. Oct. 12, 2010) ..................... 22

*Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, ,
   No. 06-770-C, 2007 WL 2489711 (M.D. La. Aug. 29, 2007)................. 26

*Kost v. Kozakiewicz*,
   1 F.3d 176 (3d Cir. 1993) ........................................................................... 7

*Kunji Harrisburg, LLC v. Axis Surplus Ins. Co.*,
   2020 WL 1469905 (E.D. Pa. Mar. 18, 2020).............................................. 9

iv

*Larkin v. Geico Gen. Ins. Co.*,
    2015 WL 667515 (E.D. Pa. Feb. 13, 2015) ........................................................................ 8

*Mama Jo's, Inc. v. Sparta Ins. Co.*,
    No. 17-cv-23362, 2018 WL 3412974 (S.D. Fla. June 11, 2018)............................................. 32

*Mastrobuono v. Shearson Lehman Hutton*,
    514 U.S. 52 (1995)............................................................................................................... 9

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010)................................................................................................. 18

*Meyer Nat. Foods, LLC v. Liberty Mut. Fire Ins. Co.*,
    218 F. Supp. 3d 1034 (D. Neb. 2016) ................................................................................ 15

*Michael Carbone, Inc. v. Gen. Acc. Ins. Co.*,
    937 F. Supp. 413 (E.D. Pa. 1996) ....................................................................................... 9

*Motorists Mutual Ins. Co. v. Hardinger*,
    131 Fed. Appx. 823 (3d Cir. 2005)......................................................................... 28, 30, 31

*Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*,
    No. CIV.A.01-4679, 2002 WL 31247972 (E.D. Pa. Sept. 30, 2002) ......................... 20, 24, 27

*Nat'l Liab. & Fire Ins. Co. v. Brimar Transit, Inc.*,
    433 F. Supp. 3d 747 (W.D. Pa. 2020)................................................................................... 8

*Newman Myers Kreines Gross Harris P.C. v. Great N. Ins. Co.*,
    17 F. Supp. 3d 323 (S.D.N.Y. 2014)................................................................................... 33

*One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520,
    2015 WL 2226202 (N.D. Ill. April 22, 2015) ..................................................................... 29

*Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*,
    No. 1:15-CV-01932-CL, 2016 WL 3267247 (D. Or. June 7, 2016)........................... 29, 30, 31

*Paradies Shops, Inc. v. Hartford Fire Ins. Co.*,
    No. 1:03-CV-3154-JEC, 2004 WL 5704715 (N.D. Ga. Dec. 15, 2004)................................. 26

*Pennsylvania, Dep't of Pub. Welfare v. Sebelius*,
    674 F.3d 139 (3d Cir. 2012)................................................................................................ 10

*Phila. Parking Auth. v. Fed. Ins. Co.*,
    385 F. Supp. 2d 280 (S.D.N.Y. 2005).............................................................................. 33, 34

*Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*,
   976 F.2d 1037 (7th Cir. 1992) ................................................................ 14

*Port Auth. Of N.Y. & N.J. v. Affiliated FM Ins. Co.*,
   311 F.3d 226 (3d Cir. 2002) ................................................................... 30

*Sames v. Gable*,
   732 F.2d 49 (3d Cir.1984) ...................................................................... 11

*Sciolla v. W. Bend Mut. Ins. Co.*,
   987 F. Supp. 2d 594 (E.D. Pa. 2013) ............................................... 12, 13

*Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*,
   64 F.3d 1991 (6th Cir. 1995) .................................................................. 27

*Shahid v. Borough of Darby*,
   666 Fed.Appx. 221 (3d Cir. 2016) ............................................................ 7

*Ski Shawnee, Inc. v. Commonwealth Ins. Co.*,
   No. 3:09-cv-2391, 2010 WL 2696782 (M.D. Pa. July 6, 2010) .............. 26

*Spector v. Fireman's Fund Ins. Co.*,
   451 F. App'x 130 (3d Cir. 2011) ............................................................... 8

*Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Connecticut*,
   No. 05-1315-JE, 2007 WL 464715 (D. Or. Feb. 7, 2007) ................. 29, 31

*Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*,
   No CV 17-04908 AB, 2018 WL 3829767 (C.D. Cal. July 11, 2018)........ 27

*TRAVCO Ins. Co. v. Ward*,
   715 F. Supp. 2d 699 (E.D.Va. 2010) ....................................................... 28

*United Air Lines, Inc. v. Insurance Co. of the State of Pennsylvania*,
   439 F.3d 128 (2d Cir. 2006)..................................................................... 22

*Universal Image Productions, Inc. v. Chubb Corp.*,
   703 F. Supp. 2d 705 (E.D. Mich. 2010), the court granted...................... 32

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*,
   712 F.3d 165 (3d Cir. 2013)....................................................................... 8

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965)................................................................................. 10

*Warren Gen. Hosp. v. Amgen Inc.,*
643 F.3d 77 (3d Cir. 2011) ........................................................................................ 7

*White Motor Co. v. United States,*
372 U.S. 253 (1963).................................................................................................. 10


**State Cases**

*Betz v. Erie Ins. Exch.,*
2008 PA Super 221 A.2d 1244 (2008) .................................................................... 27

*Bishops, Inc. v. Penn Nat. Ins.,*
984 A.2d 982 (Pa. Super. Ct. 2009) ........................................................................ 13

*Bubis v. Prudential Prop. & Cas. Ins. Co.,*
718 A.2d 1270 (Pa. Super. 1998)............................................................................ 27

*Collister v. Nationwide Life Ins. Co.,*
388 A.2d 1346 (Pa. 1978) ....................................................................................... 12

*Dundee Mut. Ins. Co. v. Marifjeren,*
587 N.W.2d 191 (N.D. 1998) .................................................................................. 29

*Farmers Ins. Co. of Oregon v. Trutanich,*
858 P.2d 1332 (Or. 1993) ................................................................................. 28, 31

*Friends of Danny DeVito v. Wolf,*
227 A.3d 872 (Pa. 2020) .................................................................................. 23, 35

*General Mills, Inc. v. Gold Medal Insurance Co.,*
622 N.W. 2d 147 (Minn. Ct. App. 2001) ................................................................ 30

*Haun v. Cmty. Health Sys., Inc.,*
14 A.3d 120 (Pa. Super. Ct. 2011) ......................................................................... 18

*Madison Constr. Co. v. Harleysville Mut. Ins. Co.,*
735 A.2d 100 (Pa. 1999) ..................................................................................... 8, 14

*Mastellone v. Lightning Rod Mut. Ins. Co.,*
884 N.E.2d 1130 (Ohio Ct. App. 2008) ............................................................ 31, 32

*Miller v. Boston Ins. Co.,*
218 A.2d 275 (1966) .................................................................................................. 9

*Murray v. State Farm Fire & Cas. Co.*,
    509 S.E.2d 1 (W.Va. 1998) ................................................................................... 29

*Nova Cas. Co.*,
    No. A-3554-17T2, 2019 WL 1422918 (N.J. Super. Ct. App. Div. Mar. 29, 2019) ................. 23

*Roundabout Theatre Co., Inc. v. Cont'l Cas. Co.*,
    751 N.Y.S.2d 4 (N.Y. App. Div. 2002) ................................................................... 33

*Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*,
    563 N.W.2d 296 (Minn. Ct. App. 1997) ................................................................... 28

*Sullivan v. Std. Fire Ins. Co.*,
    No. 515, 2007, 2008 WL 361141 (Del. Feb. 11, 2008) ................................................. 28

*Sun Co. v. Pa. Tpk. Comm'n*,
    708 A.2d 875 ................................................................................................... 9

*Sunbeam Corp. v. Liberty Mut. Ins. Co.*,
    781 A.2d 1189 (Pa. 2001) ........................................................................... 18, 19

*Swarner v. Mut. Ben. Grp.*,
    72 A.3d 641 (Pa. Super. Ct. 2013) ................................................................. 13, 14

*Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*,
    968 A.2d 724 (N.J. App. 2009) ............................................................................. 29

*Western Fire Ins. Co. v. First Presbyterian Church*,
    437 P.2d 52 (Colo. 1968) ..................................................................................... 28

## Federal Rules

Fed. R. Civ. P. 8(a)(2) ............................................................................................. 7

Fed. R. Civ. P. 11(b) .............................................................................................. 35

Fed. R. Civ. P. 56 ...................................................................................... 9, 10, 11

Fed. R. Civ. P. 12 ......................................................................................... 7, 9

## Other Authorities

Restatement (Second) of Contracts § 206 ..................................................................... 9

## I.    INTRODUCTION

LH Dining LLC ("River Twice" or "Plaintiff") is a premium quality restaurant located in Philadelphia that had a thriving business prior to the onset of the Coronavirus pandemic.  When the pandemic hit the nation, including Pennsylvania and Philadelphia specifically, government officials acted in an effort to control the pandemic and the spread of the virus.  In Pennsylvania, the Governor, and in Philadelphia, the Mayor and the Department of Health, issued orders that required restaurants to close.  The initial orders required the complete shutdown of restaurants, while subsequent orders permitted limited services.[1]

River Twice was required to abide by these orders and did so.  However, in anticipation that one day such a closure might occur causing River Twice to suffer business interruption, business income and extended expense losses, River Twice had purchased an ***ALL RISK*** business interruption policy from the Defendant Admiralty Indemnity Co. ("Admiralty") to help it weather any potential financial storm caused by a forced closure.

River Twice is one of thousands of restaurants and other businesses around the country that have similarly been forced to close operations because of the pandemic and suffer losses.  The situation has permeated the economy and been the subject of much national scientific and political debate.  In the litigation world, a request was been made to the federal court system to create a multidistrict litigation proceeding to manage the cases.[2]  Also, as noted in the Declaration of Richard M. Golomb, Esquire (co-counsel for Plaintiff here, and attached as Exhibit A hereto), a number of different types of approaches are being considered to handle the financial consequences

---

[1] A more fulsome discussion of the Civil Authority Orders is set forth *infra* at Section VI.B.

[2] The Judicial Panel for Multidistrict Litigation has assigned MDL No. 2942 to the matter and shortly after the filing of this brief will hear argument, on July 30, 2020, to determine whether to formally create an MDL docket and assign a transferee Court.  Plaintiff will update the Court with the result of the MDL Panel determination when issued.

of businesses suffering interruption and losses.  *Id.* at ¶ 10 (including discussing "Black Swan" approach by Chubb Insurance).

But against this backdrop of uncertainty in the country, Admiralty asserts that it owes Plaintiff no benefits under its All Risk policy.  This, despite Plaintiff having paid valuable premium payments to Admiralty to protect itself against the very types of losses sustained and intended to be covered by an All Risk policy.  Admiralty wrongly asserts the following bases to support its Motion to Dismiss:

1.    The Virus Exclusion in the insurance policy (the "Policy") with Plaintiff bars coverage for Plaintiff's losses;

2.    The Policy's Civil Authority coverage does not apply because they did not prohibit access to the insured premises were issued to prevent the future spread of Coronavirus (COVID-19), not because of damage to property.

3.    The First Amended Complaint (FAC) does not allege physical loss of or damage to plaintiff's property or nearby property caused by a Covered Cause of Loss; and

4.    The Policy's Business Income coverage does not apply.

*See* Motion to Dismiss, D.E. # 29.  Rather than provide benefits to Plaintiff for losses as to which Admiralty received valuable premiums, the Defendant instead seeks to foreclose such coverage through litigation based on invalid policy interpretations.  In addition, Admiral relies on two cases recently decided by a federal court in New York applying New York law and a state court in Michigan applying Michigan law in further support of its Motion.

As discussed herein, the Motion should be denied outright, or at the minimum, a decision on the motion should be stayed pending an opportunity for Plaintiff to take discovery in this matter to address the many factual issues that the Motion raises, regardless of Defendant's effort to describe the issues as presenting pure questions of law.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.          COVID-19 Hits the United States and Pennsylvania

In and around January 2020, the United States began to see its first cases of COVID-19. As the pandemic worsened and spread across the nation, federal, state and local authorities took action to address the pandemic and provide for the safety and welfare of the public.   In Philadelphia, Pennsylvania, where River Twice is located, the Governor, the Mayor and other local officials all took action.  Accordingly, on March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency, a formal recognition of an emergency situation in this Commonwealth due to the pandemic.  *See* FAC ¶ 46 and Civil Authority Order.  Just ten days later, on March 16, the City of Philadelphia announced the mandatory closure of all non-essential businesses, including restaurants such as Plaintiff's, with the Order stating specifically that restaurants "cannot allow dine-in services."  *See*  https://www.phila.gov/2020-03-16-city-announces-new-restrictions-on-business-activity-in-philadelphia/ (last visited July 21, 2020); FAC ¶ 47.  Shortly thereafter, on March 19, 2020, Governor Wolf issued a more restrictive order that required  all non-life-sustaining businesses in the Commonwealth to cease operations and close all physical locations, with an explicit and terse "prohibition on Dine-In Facilities including Restaurants and Bars" thus, effectively serving as a doubling down on the City of Philadelphia's closure order just three days prior that mandated Philadelphia restaurants to close their doors to customers.   *See*  https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order (last visited July 21, 2020); FAC ¶ 48. Then, on March 22, 2020, Philadelphia Mayor Jim Kenney issued an Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses, specifically noting that "dine-in service" and "walk-in ordering" are "strictly prohibited."  *See* FAC ¶ 49 and Civil Authority Order. (emphasis added).  Thus, in just a matter of six days, Philadelphia businesses were subjected to three mandatory closure orders

issued by the City of Philadelphia and the Commonwealth of Pennsylvania, all of which explicitly prohibited restaurants from allowing patrons access to their premises. *See* FAC and Civil Authority Orders.

The status of the closures has not been stagnant because the Coronavirus and the pandemic itself have not been stable. To the contrary, there have been flares and surges of cases, requiring governmental authorities to modify and re-issue orders to address the fluid situation for the safety of the public.

### B. Impact on River Twice Restaurant

River Twice owns and operates an upscale modern American restaurant that thrives on offering its customers an exceptional dine-in restaurant experience. FAC ¶¶ 9, 63, 64. Due to the government closure orders detailed above, Plaintiff was forced to suspend operation of its physical location and prohibit patrons from accessing the restaurant beginning on March 16, 2020 and continuing to the present day. FAC ¶ 58; *see also* https://www.phila.gov/2020-03-16-city-announces-new-restrictions-on-business-activity-in-philadelphia/ (last visited July 20, 2020); https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order (last visited July 20, 2020). Thus, starting on March 16, 2020, Plaintiff lost the functionality and utility of its business including, but not limited, to its dining room, bar, private dining space, tables and chairs. FAC ¶ 58. Understandably, Plaintiff suffered immense business income losses resulting from the government-issued mandatory closure orders. FAC ¶ 32.

There can be no dispute here that Plaintiff has alleged that it suffered business income loss, business interruption and extended business expenses, all of which are the types of losses covered by Defendant's insurance Policy issued to Plaintiff, and these facts are well pleaded in the FAC and must be accepted as true for purposes of this Motion.

**C.     Admiral Indemnity Company Insurance Policy and its Current Dispute with Plaintiff**

Prior to the mandatory closure orders, Plaintiff purchased from Defendant a commercial insurance policy with Policy Number 21-31876937-30 issued for the period of September 23, 2019 to September 23, 2020 (hereinafter "Policy"), which provides coverage to Plaintiff for losses sustained due to the necessary suspension of its operations. FAC ¶¶ 11-13 and Policy.  Plaintiff, who had no part in the drafting of the Policy language, purchased the policy and paid substantial premiums to Defendant with the reasonable expectation that Defendant would provide for business income loss, extra expense, and civil authority coverage. FAC ¶ 15.  There is no dispute that the Policy is in full force and effect.

Relevant to the pending motion, the Policy contains specific coverage for any mandated suspension of business operation at the insured's location by order of government authority—a provision known in the insurance industry as Civil Authority Coverage.  *See* Policy at p. 57. Specifically, the Civil Authority provision of Plaintiff's Policy reads:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.*  Put simply, in the event of a mandatory closure by order of government where access to the premises is prohibited, as is the case here, Defendant is to provide coverage for Plaintiff's business income losses.

Plaintiff's Policy also contains an "Exclusion of Loss Due to Virus or Bacteria" endorsement, which purports to exclude coverage "for loss or damage caused by or resulting from any virus, bacterium or other micro-organism." *See* Policy at p. 79.  However, as detailed *infra* Section IV.A and B, such an exclusion is immaterial to the present claims as Plaintiff's losses are the result of the government-issued mandatory closure orders, and not the virus itself.  Further, there is a dispute as to whether the Virus Exclusion even pertains to a Pandemic.[3]

Due to the mandated closure orders issued by the Commonwealth of Pennsylvania and the City of Philadelphia, Plaintiff commenced the present action on April 17, 2020[4] seeking a declaration that it is entitled to coverage under the Civil Authority provision of its Policy issued by Defendant.  Defendant filed the present Motion to Dismiss the FAC on July 13, 2020.

---

[3] In other cases pending before this Court where the defendants in those cases did not file a motion to dismiss but instead filed Answers, policyholders have served discovery on a third party, ISO, to obtain information about the development of the Virus Exclusion language that appears in standard form in many policies.  *See* Ex. A at ¶ 8.  This discovery, along with discovery from Defendant here on the same issue, is critical for the Court to rule here, since the heavy reliance that Defendant places on the Virus Exclusion language very well may be totally misplaced.  *Id.*

[4] Defendant had filed an Answer to the original Complaint. Defendant then filed a Motion for Judgment on the Pleadings [D.E. # 18] In response, Plaintiff had a meet and confer with Defendant's counsel about Plaintiff filing an Amended Complaint. Defendant refused consent. Plaintiff then filed a Motion for Leave to file an Amended Complaint [D.E. # 23], wherein Plaintiff suggested that such a filing would moot the pending Motion for Judgment on the Pleadings.  This Court granted Plaintiff's Motion for Leave to Amend the Complaint [Order, D.E. # 26] and denied the Motion for Judgment on the Pleadings as moot.  Plaintiff's Amended Complaint was deemed filed by the Court on June 29, 2020.

III.    **APPLICABLE LEGAL STANDARDS**

A.    **Standard for Motion to Dismiss in an Insurance Contract Case**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).

In deciding a motion to dismiss under Rule 12(b)(6), courts must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quoting *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)) (internal quotation marks omitted).

A plaintiff's pleading obligation is to set forth "'a short and plain statement of the claim,'" which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" *Warren Gen. Hosp. v. Amgen Inc*., 643 F.3d 77, 84 (3d Cir. 2011) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). "The plausibility standard is not akin to a 'probability requirement'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556), but it "'requires showing more than a sheer possibility that a defendant has acted unlawfully.'" *Shahid v. Borough of Darby*, 666 Fed.Appx. 221, 222 n.1 (3d Cir. 2016) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)). In the end, the court will only grant a motion to dismiss brought

7

pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "'to raise a right to relief above the speculative level.'" *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013) (quoting *Twombly*, 550 U.S. at 555). In essence, judgment on the pleadings cannot be granted where there is an issue of fact which would support recovery. *See Nat'l Liab. & Fire Ins. Co. v. Brimar Transit, Inc.*, 433 F. Supp. 3d 747, 757 (W.D. Pa. 2020) (citing *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church* 887 F.2d 228, 230 (9th Cir. 1989)).

In the context of pleadings related to insurance policies and interpreting insurance policies, the court must read each policy as a whole and construe its meaning according to its plain language. *Spector v. Fireman's Fund Ins. Co.,* 451 F. App'x 130, 136 (3d Cir. 2011). "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 735 A.2d 100, 106 (Pa. 1999) (citation and internal quotation marks omitted). A provision is ambiguous if reasonable people could fairly ascribe differing meanings to it. *Larkin v. Geico Gen. Ins. Co.*, 2015 WL 667515, at *3 (E.D. Pa. Feb. 13, 2015) (citing *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.,* 193 F.3d 742, 746 (3d Cir. 1999)). Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Constr. Co.*, 735 A.2d at 105. "Ambiguity is not to be resolved in a vacuum. Contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Colony Ins. Co. v. Zena Assocs., LLC*, 2012 WL 12897100, at *2 (E.D. Pa. Dec. 17, 2012) (citing *Madison Const.*, *supra*).

Further, in an adhesion contract – a contract drafted by one party and signed by another party – it is well established that "in construing any written instrument, and particularly an

insurance contract, the instrument must be strictly construed against the writer." *Kunji Harrisburg, LLC v. Axis Surplus Ins. Co.*, 2020 WL 1469905, at *3 (E.D. Pa. Mar. 18, 2020) (citing *Miller v. Boston Ins. Co.*, 218 A.2d 275, 277 (1966). *See also Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 62–63 (1995) (ambiguities are construed in favor of the non-drafting party). "Under the rule of *contra proferentem,* any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable." *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) (citing *Sun Co. v. Pa. Tpk. Comm'n,* 708 A.2d 875, 878–79 (Pa.Commw.Ct.1998; Restatement (Second) of Contracts § 206)).

**B.    Defendant's Motion is Crafted in the Nature of a Motion for Summary Judgment Even if Styled as a Motion to Dismiss, But the Standard to Apply to a Motion to Dismiss is Much Different and Favorable to a Plaintiff Who Has Not Yet Had an Opportunity to Take Discovery and Develop the Case Facts**

The threshold question and proof necessary in a 12(b)(6) motion is in stark contrast to the standard set forth in a Rule 56 summary judgment motion.  A Rule 12 motion is filed at the close of pleadings and determines whether a plaintiff's claims lack facial plausibility.  On the other hand, a Rule 56 motion is filed after the close of all discovery, and the movant must prove that there is no genuine dispute as to any material fact at which point the movant is entitled to judgment as a matter of law.  Moreover, in a summary judgment motion, the court considers all cited materials and may also examine evidence beyond the pleadings.  Fed. R. Civ. P. 56(c)(3); *see also Michael Carbone, Inc. v. Gen. Acc. Ins. Co.*, 937 F. Supp. 413, 416 (E.D. Pa. 1996).

Here, regardless of how Defendant has attempted to characterize its Motion and avoid it appearing as a Motion for Summary Judgment, the reality is that Defendant's Motion raises complex factual issues involving the interpretation of the Policy and its provisions.  Defendant has made a factual challenge – that Plaintiff's damage was not caused by "direct physical loss of or damage to its property"; that any injury suffered as a result of the coronavirus pandemic is

foreclosed under the policy's virus exclusion; and that the Civil Authority grant of coverage does not apply – at this early stage in the proceedings in an attempt to strip Plaintiff of the protections and deference to the facts as pleaded by the Plaintiff that is provided under 12(b)(6) review.  In a motion to dismiss, the factual allegations of a pleading are taken as true.  The Court must construe the pleading in the manner most favorable to the nonmovant and decide whether, on the face of the claim, a claim is stated upon which relief can be granted, and must bear in mind the policy that, unless there is no doubt as to the result, cases should be analyzed based upon their merits. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965), *see also White Motor Co. v. United States*, 372 U.S. 253 (1963). "[A] court may not dispose of the case on the merits without giving the opposing party a reasonable opportunity to present to the court material relevant to the dispositive issue." *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 154 (3d Cir. 1985).

Nevertheless, Plaintiff wants to be clear that it has no desire in converting this motion into a summary judgment motion now.  And no notice has been given by or to the parties of such conversion. However, in an abundance of caution, if the Court were to consider the instant Motion to be more equivalent to a motion for summary judgment because of the fact disputes that it raises, Rule 56(d) allows for a nonmovant to show the court that essential facts or issues exist to justify that the court should defer consideration of such a motion through the showing of affidavits or declarations.  Fed. R. Civ. P. 56(d).  In *Dowling v. City of Phila.,* 855 F.2d 136, 140-41 (3d Cir.1988), the Third Circuit construed Rule 56(d) as requiring that "a party seeking further discovery in response to a summary judgment motion submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *See Pennsylvania, Dep't of Pub. Welfare v. Sebelius*,

674 F.3d 139, 156 (3d Cir. 2012) (stating that Rule 56(d) specifies procedure to be followed when party opposing summary judgment believes that additional time for discovery is necessary). The Third Circuit has held that "a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course" if the party opposing summary judgment files an affidavit addressing the above-mentioned three requirements with specificity, and particularly when detailed information, necessary to the successful opposition to summary judgment, is in the sole possession of the moving party. *Sames v. Gable,* 732 F.2d 49, 51 (3d Cir.1984); *see also Atl. Deli & Grocery v. United States,* 2011 WL 2038758, at *3 (D.N.J. May 23, 2011).

Here, no discovery has taken place to date.  Yet a significant amount of discovery will be required, including direct discovery from Defendant and third party discovery as well.[5]  Moreover, expert interpretation of some of the terms and phrases in the Policy will be relevant here for the interpretation of the Policy.[6]   At this Motion to Dismiss stage, Defendant is attempting to deprive Plaintiff from developing a proper record for the case.[7]

Accordingly, aside from relying on the fact that Defendant has a stiff burden to meet to gain a dismissal of this case under Rule 12 (b) (6) that it has not met, Plaintiff respectfully also suggests that it is entitled to discovery under Rule 56 (d) before any action can be taken on

---

[5] *See, i.e.,* ISO subpoenas at Exhibit A (Golomb Decl.) and attachments 1 and 2 therein.

[6] *See, i.e.,* Declaration of Tom Baker, a University of Pennsylvania Wharton professor, on some of the common words and phrases used in policies, at Exhibit A (Golomb Decl.) and attachment 3 therein.

[7] *See* Exhibit A (Golomb Decl.) at ¶14 ("In addition, to address fact questions raised by Defendant in its Motion, expert discovery may be necessary on such matters as: the science of the Coronavirus, sanitation issues, persistence of the Coronavirus in the atmosphere and within properties and adjacent properties, expert opinion about impact of the Coronavirus on property, the meaning of the Civil Authority Orders among other issues.  Defendant's attempt to gloss over these factual issues and need for expert evidence should not be countenanced.")

Defendant's Motion because of it raising factual issues involving the interpretation of the Policy

and its provisions and factual issues relating to the Civil Authority Orders, the extent of the impact

of those Orders on Plaintiff, Plaintiff's compliance with the Orders.

## IV.   ARGUMENT

### A.   The Court Should Not Enforce Defendant's Virus Exclusion

#### 1.   Plaintiff's Contract Is Inherently Adhesive and Controlling Pennsylvania[8] Law Dictates it Must be Analyzed with Careful Scrutiny

An insurance contract, like that obtained by the Plaintiff here, is an inherently adhesive

instrument.  The Pennsylvania Supreme Court definitively agrees:

> The traditional contractual approach fails to consider the true nature
> of the relationship between the insurer and its insureds. Only
> through the recognition that insurance contracts are not freely
> negotiated agreements entered into by parties of equal status; only
> by acknowledging that the conditions of an insurance contract are
> for the most part dictated by the insurance companies and that the
> insured cannot "bargain" over anything more than the monetary
> amount of coverage purchased, does our analysis approach the
> realities of an insurance transaction.

*Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978) (citation omitted).  As a

result, courts must employ special considerations when applying Pennsylvania law to analyze an

---

[8] Because the underlying location of the insured risk (the property) is located in Pennsylvania, the interpretation of the Policy is to be made pursuant to Pennsylvania law. Defendant agrees. *See* Motion to Dismiss, D.E. # 29 at p. 15-16; *see also Sciolla v. W. Bend Mut. Ins. Co.*, 987 F. Supp. 2d 594, 599 (E.D. Pa. 2013) (applying Pennsylvania law in a diversity case when the parties agreed Pennsylvania law applied).  Because this is a diversity case, if the court were to engage in a choice of law analysis, Pennsylvania law still applies. "[U]nder Pennsylvania choice of law principles, the state which has the most interest in settling the dispute and which is the most concerned with its outcome is the state whose law should be applied." *Celebre v. Windsor-Mount Joy Mut. Ins. Co.*, No. CIV. A. 93-5212, 1994 WL 13840, at *1 (E.D. Pa. Jan. 14, 1994) (citation omitted). "[T]he principal location of the insured risk should govern which state's law applies in a first-party property insurance case." *Id.* at *3. Here, the Plaintiff's business, location of loss, and insured property are all in Pennsylvania, which leaves no dispute that Pennsylvania law applies.

insurance contract. *See Bishops, Inc. v. Penn Nat. Ins.*, 984 A.2d 982, 989 (Pa. Super. Ct. 2009) ("When interpreting a policy of insurance, we employ an analysis which, while derived from the law of contracts, recognizes that most insurance transactions are not freely bargained between equals but are largely adhesive in nature.") (citation omitted).

Accordingly, a court applying Pennsylvania law must resolve any contractual ambiguities in favor of the insured. *See Sciolla v. W. Bend Mut. Ins. Co.*, 987 F. Supp. 2d 594, 599 (E.D. Pa. 2013) ("Ambiguous insurance policy provisions are construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage.") (citations and quotations omitted) (applying Pennsylvania law). ***Most importantly,*** Courts must strictly construe an exclusion against the insurer who is trying to rely upon it. *Swarner v. Mut. Ben. Grp.*, 72 A.3d 641, 645 (Pa. Super. Ct. 2013) ("Exclusionary clauses generally are strictly construed against the insurer and in favor of the insured.").[9]

### 2.     The Virus Exclusion in Plaintiff's policy is Ambiguous and Does Not Apply.

Given that exclusions must be strictly construed against the insurer and any ambiguities resolved in favor of the insured, any ambiguity in the exclusion inures to the benefit of the Plaintiff. The relevant language of Defendant's Virus Exclusion provides: "[w]e will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease[.]" *See* Motion to Dismiss, D.E. # 29 pp. 13-14. However, Government orders and not a virus is what caused Plaintiff's business losses. *See* FAC ¶ 33 ("The virus and bacterium exclusions do not apply because Plaintiff's losses were not

---

[9] *See* Section III.A *infra.*

13

directly caused by a virus, bacterium or other microorganism. Instead, Plaintiff's losses were caused by the entry of Civil Authority Orders, particularly those by Governor Wolf and by the Pennsylvania Department of Health, to mitigate the spread of COVID-19.").

"Policy provisions are ambiguous . . . when they are reasonably susceptible of different constructions and capable of being understood in more than one sense." *Swarner*, 72 A.3d at 645 (citation and quotations omitted). "[This is also not a question] to be resolved in a vacuum. [Rather], contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999).

Here, the relevant language from the Virus Exclusion is subject to more than one reasonable interpretation when applied to the particular factual circumstances present. Plaintiff has specifically pled that the Civil Authority Orders caused its losses and not the virus itself. *See* FAC ¶ 33. What is at issue here is what Plaintiff has pleaded, not how Defendant prefers to interpret the FAC. Under the factual circumstances, Plaintiff's manner of pleading the claim is completely reasonable and should be accepted for purposes of this Rule 12 Motion. What Defendant is attempting to do, however, is to extend the language of the Virus Exclusion to apply to a claim based on damage caused by orders of a civil authority. In essence, Defendant is attempting to mix the apples from one part of the Policy with the oranges of another part of the Policy. Doing so defies the basic principles Pennsylvania courts apply when interpreting an insurance exclusion: strict construction. Defendant's reading of the exclusion is limitless and would produce absurd results. *See Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992) ("Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results."). Here,

Defendant has one goal and one goal only—to avoid coverage—which would be an absurd result where an insured has paid good money in a premium for the purchase of coverage to protect itself from business interruption, only for the carrier to assert multiple reasons that the Policy really does not provide that coverage at all.

Further supporting Plaintiff's argument that the Virus Exclusion does not preclude this case is the fact that in no way does it mention a pandemic situation or exclude anything related to the damages incurred as result of a pandemic.  With the black letter law cited above holding that ambiguities in policies are to be construed against the carrier, the absence of the Policy making any mention whatsoever of the word "pandemic" and this case being based on a pandemic, leads to the conclusion that Defendant is not entitled to dismissal.

The World Health Organization has categorized COVID-19 as a pandemic.  *See* FAC ¶ 39. Merriam and Webster's defines pandemic as "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population: a pandemic outbreak of a disease[.]"[10]  Other insurers have been much more specific in drafting and specifically using the pandemic language.  *See, e.g*, *Meyer Nat. Foods, LLC v. Liberty Mut. Fire Ins. Co.*, 218 F. Supp. 3d 1034, 1038 (D. Neb. 2016) ("The actual or suspected presence or threat of any virus, organism or like substance that is capable of inducing disease, illness, physical distress or death, whether infectious or otherwise, including but not limited to any epidemic, pandemic, influenza, plague, SARS, or Avian Flu.").  The Court should not reward the Defendant for failing to properly draft its exclusion nor permit it to expand the scope of its Virus Exclusion that does not address a pandemic.

---

[10] *See* https://www.merriam-webster.com/dictionary/pandemic (last visited July 22, 2020).

Accordingly, because Plaintiff's losses were not specifically caused by a virus, because Plaintiff's Policy is an all-risk policy, and because the Virus Exclusion does not address a pandemic, Plaintiff's losses should be covered.  An all-risk policy includes coverage for all risks unless specifically excluded.[11]  Here, there is no such specific exclusion, so the all-risk policy at issue should be found to specifically protect against Plaintiff's COVID-19 losses.

### 3. Dismissing Plaintiff's Case Based Upon the Virus Exclusion at this Stage Would be Premature

Ultimately, the issue raised in Defendant's Motion to Dismiss regarding the Virus Exclusion is not ripe at this stage of the litigation.  *See supra* Section III.B.  Material and complex factual issues—including the validity, purpose, and scope of the Virus Exclusion—have not yet been fully investigated.  For example, Defendant claims, without support, that Plaintiff did not pay for virus coverage.  Discovery is necessary to determine whether including the Virus Exclusion resulted in a decrease in premiums (if in fact it was crafted to exclude significant coverage) and how it should be interpreted.  Plaintiff here also intends to serve discovery on the ISO regarding how the Virus Exclusion was drafted, correspondence with Pennsylvania insurance regulators relating to the Virus Exclusion, and whether regulatory estoppel should apply because of misleading or inaccurate representations to the Department of Insurance that were used to gain approval of the Virus Exclusion included in Defendant's Policy.  *See* Ex. A.  This discovery is

---

[11] "All-risks coverage provides coverage for any incident that an insurance policy doesn't specifically exclude."  *See*  https://www.investopedia.com/terms/a/all-risks-coverage.asp  (last visited July 21, 2020); *see also* FAC ¶ 18 ("An all-risk policy is one that protects against catastrophic events, such as the Coronavirus (also known as COVID-19).  COVID-19, a pandemic currently being experienced on a global scale, has resulted in the widespread, omnipresent and persistent presence of COVID-19 in and around Plaintiff's Insured Property and adjacent properties.").

necessary to determine whether the Virus Exclusion applies in this case and whether it was even applied to Plaintiff's Policy properly.

### 4.    Plaintiff's Regulatory Estoppel Theory Provides an Adequate Basis for Further Investigation

"[U]nder Pennsylvania's doctrine of regulatory estoppel, an industry that makes representations to a regulatory agency to win agency approval will not be heard to assert the opposite position when claims are made by litigants such as insured policyholders." *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207, 211 (3d Cir. 2010) (citation, quotations, and emphasis omitted); *see also Hussey Copper, Ltd. v. Royal Ins. Co. of Am.*, 567 F. Supp. 2d 774, 786 (W.D. Pa. 2008) ("The regulatory estoppel inquiry is different, however, as it focuses on the insurance industry's purported representations to state regulators) (report and recommendation of the magistrate judge adopted fully by the district judge) (applying Pennsylvania law). *Hussey* is particularly on point because the Court permitted discovery regarding plaintiff's regulatory estoppel theory, focusing on what was said to state regulators in getting an insurance exclusion approved.  That is exactly what Plaintiff is asking for here.

Plaintiff has specifically alleged that:

> [T]he Virus Exclusion was first permitted by state insurance departments due to misleading and fraudulent statements by the ISO that property insurance policies do not and were not intended to cover losses caused by viruses, and so the Virus Exclusion offers mere clarification of existing law.  To the contrary, before the ISO made such baseless assertions, courts considered contamination by a virus to be physical damage.  Defendant's use of the Virus Exclusion to deny coverage here shows that the Virus Exclusion was fraudulently adopted, adhesionary, and unconscionable.

FAC ¶ 34.  The document upon which Plaintiff relies in the Amended Complaint for such allegations highlights that Insurers should be precluded from using the Virus Exclusion because

of misrepresentations they made to regulators.  *See* https://www.propertycasualty360.com/2020/04/07/here-we-go-again-virus-exclusion-for-covid-19-and-insurers/ (last visited July 22, 2020) ("Having falsely claimed that virus and contamination exclusions were already in effect, that they were requesting regulatory approval for a mere clarification in the form, and that therefore no premium reduction was warranted, the insurance industry should now be prevented from relying on these exclusions to bar coverage for COVID 19 claims.").[12]

Like in *Hussey,* discovery on what Defendant and/or ISO said to Pennsylvania regulators in getting the Virus Exclusion approved should be permitted.  As the Hussey Court aptly noted: "[o]nce the facts come in, counsel may raise anew their arguments for and against coverage given the regulatory estoppel doctrine. At that time, the parties and court will have greater context within which to conduct their analyses." *Hussey,* 567 F. Supp. 2d at 787.

Regulatory estoppel is also firmly rooted in Pennsylvania law based upon the Pennsylvania Supreme Court's decision in *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189 (Pa. 2001). In *Sunbeam*, the Pennsylvania Supreme Court reversed the Superior Court's grant of preliminary objections in the nature of a demurrer instructing the trial court to apply the doctrine of regulatory estoppel.[13]   The Court based its decision on the following allegations from the plaintiffs' complaint:

> [I]n 1970 the insurance industry, including the defendant insurers, submitted to the Pennsylvania insurance department a memorandum

---

[12] In a Rule 12(b)(6) motion to dismiss the court may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Davis v. Wells Fargo,* 824 F.3d 333, 341 (3d Cir. 2016) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)) (internal quotation marks omitted).   Accordingly, the article Plaintiff specifically references can be examined because Plaintiff relies upon it in part for its regulatory estoppel allegations.

[13] In Pennsylvania, "[p]reliminary objections in the nature of a demurrer test the legal sufficiency of the complaint."  *Haun v. Cmty. Health Sys., Inc.*, 14 A.3d 120, 123 (Pa. Super. Ct. 2011) (citation and quotations omitted).

> which asserted that the disputed language—excluding coverage for pollution unless it was "sudden and accidental"—would not result in any significant decrease in coverage. The complaint alleged, moreover, that the insurance department relied on the industry's representation when it approved the disputed language for inclusion in standard comprehensive general liability policies without a reduction in premiums to balance a reduction in coverage.

*Id.* at 1192. The Court concluded: "[t]hus, having represented to the insurance department, a regulatory agency, that the new language in the 1970 policies—"sudden and accidental"—did not involve a significant decrease in coverage from the prior language, the insurance industry will not be heard to assert the opposite position when claims are made by the insured policyholders." *Id.* at 1192–93.[14]

### B.    The Civil Authority Orders were Issued as a Result of Damage to Property

Defendant also argues it is absolved from providing coverage under the Policy's Civil Authority provision because the Orders were issued solely to address fears of future damage, and in turn dismissal is warranted because Plaintiff fails to plead facts demonstrating that the Orders were caused by "actual and prior property damage."  However, Defendant's argument is predicated on an extremely narrow recitation of the circumstances precipitating the Orders, and a thorough review of the factual backdrop refutes these claims.  Plaintiff's FAC alleges that COVID-19 caused damage to occur in and around the surrounding location of the Premises, the City and Commonwealth issued the Orders as a direct result of that damage, and Defendant's arguments to the contrary are inadequate to support dismissal at the pleadings stage.  Even Defendant's characterization that the Orders were issued to address *fears* itself shows there is at a minimum a

---

[14] Plaintiff recognizes that a motion to dismiss under the federal rules has a more exacting plausibility standard than the one employed under Pennsylvania law in *Sunbeam*.  However, Plaintiff's allegations for regulatory estoppel are more than sufficient to withstand a Rule 12(b)(6) challenge.  Plaintiff needs more factual information regarding what was specifically said and understood regarding the Virus Exclusion by Pennsylvania regulators.

19

factual issue about the Orders (and they fit within the scope of "Covered Cause of Loss" defined by the Policy as "Risks of Direct Physical Loss").  *See* Policy at 68.

The general elements for triggering civil authority coverage require that the insured suffer a loss of business income: (1) caused by an action of a civil authority that (2) prohibits access to the described premises (3) due to a direct physical loss or damage to property other than at the described premises, and (4) the loss or damage to the property other than at the described premises must be caused by or result from a "covered cause of loss."  *Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. CIV.A.01-4679, 2002 WL 31247972, at *4 (E.D. Pa. Sept. 30, 2002)

All four of these elements are satisfied.  First, the Orders in this case mandating the closure of businesses constitute "action[s] of a civil authority" under the terms of the Policy, and Defendant does not argue to the contrary.  Next, the Orders clearly prohibit access by barring the public from the Premises by law.  *See* FAC ¶¶ 46-51, Orders, and Section II, *supra*.  Third, Plaintiff's FAC does in fact allege that the Orders were issued in response to damage to property in and around the area of the Premises.  *Id.*  Finally, the losses caused by COVID-19 and the risk of injury constitute a covered cause of loss under the terms of the Policy.

Although Defendant argues that Plaintiff fails to allege that the Orders were issued in response to actual damage, Plaintiff indisputably alleges that at the time of the entry of the Orders, the spread of COVID-19 was already underway and constituted losses to the area in and around the location of the Premises.  FAC ¶¶ 66-67.  The link between the damages and the required closure of Plaintiff's business is unmistakable and borne out by the language of the Orders, which verify that the City and Commonwealth were responding to the *ongoing* and devastating damage caused by COVID-19.  *Id.* at ¶¶ 47-50.  One need only review the plain language of the Orders to understand the City and Commonwealth sought to effectuate a dual purpose: 1) mitigate and

ultimately stop the spread of property loss *already caused* by COVID-19 and 2) prevent additional spread that may lead to future loss.  Defendant would like this Court to ignore this first goal for the purposes of its argument, but the language of the Orders makes clear that the latter goal of preventing further spread was incidental to accomplishing the former, undermining Defendant's argument.

Specifically, the March 23, 2020 Order of the Secretary of the Pennsylvania Department of Health to Stay at Home noted that "[c]ase counts of COVID-19 are rapidly increasing throughout many Pennsylvania counties" and the Order was appropriate in light of "the manner of [COVID-19]'s spread in the Commonwealth" in order to "prevent and *control the spread* of disease."  FAC at Ex. 5, p.2 (emphasis added).  That same day, the Governor of Pennsylvania issued an Order closing all non "life sustaining businesses," which stated, "all restaurants and bars previously have been ordered to close their dine-in facilities to help *stop the spread of COVID-19*."  *Id. at* ¶ 48, *see also* https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order at p.2) (last visited July 22, 2020) (emphasis added).  The Governor issued a similar stay-at-home Order on April 1, 2020, which amended his previous March 23 Order and reported "as of April 1, 2020, the Commonwealth of Pennsylvania has 5,805 positive cases of COVID-19 in sixty counties and reports 74 deaths from the virus." FAC at Ex. 6, p.1.

Defendant relies on a litany of cases it claims supports the proposition that a policyholder must prove that actual property damage has occurred for coverage to attach.  As a threshold matter, all of the cases Defendant directs this Court's attention to were decided at the *summary judgment* stage, and not the result of a motion to dismiss.  This of course again makes Plaintiff's earlier point that it is inappropriate to dismiss this case at this stage of the proceedings, before an opportunity

for Plaintiff to develop a record, and why Plaintiff also asserts Rule 56(d) in opposition to the Motion.

Defendant's contention that the civil authority provisions preclude coverage requires a tortured view of the facts here to attempt to align them with the cases Defendant relies on.  Every single case Defendant relies on concerns civil authority orders that were entered to address speculative damage that *might* occur in the future.  In this case, Plaintiff has alleged that the Orders were issued as the result of losses *already* occurring in the area adjacent to the Premises, and Defendant's line of authority is therefore distinguishable from the facts of this dispute and does not dictate granting Defendant's Motion to Dismiss.

For example, the Second Circuit in *United Air Lines* held that civil authority coverage could not apply because the prohibition of access to Ronald Reagan National Airport was based solely on fear of *future* attacks.  439 F.3d 128, 134 (2d Cir. 2006).  *Dickie Brennan* concerned a claim for business interruption losses arising out of an evacuation order for New Orleans due to the threat of Hurricane Gustav, where the Fifth Circuit held that coverage did not attach because the damage in that case occurred *solely* in the Caribbean.  636 F.3d 683, 685 (5th Cir. 2011).  Likewise, in *Kelaher*, Hurricane Florence caused a mandatory evacuation in Horry County, South Carolina, but the language of the evacuation orders did not reference "'damage or destruction of' *any property*." No. 09-6057, 2010 WL 4026375, at *8 (E.D. La. Oct. 12, 2010) (emphasis in original).  *Jones Walker* also arose out of Hurricane Gustav but is largely inapposite to this issue, as the determinative issue precluding coverage was not whether actual damage occurred, but rather that the New Orleans evacuation order expired before the conclusion of the provision's waiting period. No. 09-6057, 2010 WL 4026375, at *3-4 (E.D. La. Oct. 12, 2010).  None of these cases implicate the issuance of civil authority orders to address prior or ongoing damage, such as is the case here.

However, *Jones Walker* is relevant to this dispute inasmuch as the Court reasoned, contrary to Defendant's argument, that 1) damage is not required to precede the issuance of an order to trigger coverage ("…that is not to say that coverage cannot be triggered in the hurricane setting where the normal sequence of events is reversed…") and 2) coverage could be triggered as a result of damage flowing from a subsequent order (finding the mayor's second evacuation order could trigger civil authority coverage). *Jones* at *3.  It is also worth noting that unlike some insurance policies with a civil authority provision, the Defendant's Policy in this case expressly *does not* limit coverage to business interruption losses arising solely out of the *first* action of civil authority prohibiting access to the insured's premises.  *C.f. Mar. Park, LLC v. Nova Cas. Co.*, No. A-3554-17T2, 2019 WL 1422918, at *3 (N.J. Super. Ct. App. Div. Mar. 29, 2019).

Here, the Orders were not issued in anticipation of damage that was speculative or feared to occur at some point in the future, but rather to address actual, ongoing damage inflicted in and around the location of the Premises.  Plaintiff has alleged facts to that effect.  Furthermore, the Orders mandating the closure of businesses in the City and Commonwealth clearly reference ongoing loss or damage caused by COVID-19.  The Pennsylvania Supreme Court in fact *confirmed* that the Order caused "a temporary loss of the use of the Petitioners' business premises."  *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889-90 (Pa. 2020) (the Orders were executed "to protect the lives and health of millions of Pennsylvania citizens").  To the extent Defendant disputes Plaintiff's well-pled allegation that the damage occurred in the area of Plaintiff's premises, that is a factual dispute more properly resolved through the discovery process.  Finally, the Orders absolutely prohibited access to the Premises; customers were prevented from entering and dining at the Plaintiff's restaurant.  *See infra.*  Taking Plaintiff's allegations as true for the purposes of the Motion to Dismiss, Plaintiff has clearly satisfied its burden under the law to state a claim for

coverage under the Civil Authority provision of the Policy, and Defendant's Motion must be denied.

### 1. The Civil Authority Orders Prohibit Access to Plaintiff's Premises

Defendant alternatively argues that the Civil Authority provision in the Policy does not apply because the Orders do not prohibit access to the Premises. Defendant is incorrect and the argument is contrary to Plaintiff's allegations in the FAC. The purpose of the Orders as they relate to businesses such as Plaintiff's is unambiguous: the operation of walk-in ordering and dine-in service, the very amenities that Plaintiff exists to provide to customers and the potential interruption of which Plaintiff's Policy sought to protect against, are ***strictly prohibited by law***. *See* Civil Authority Orders.

Despite the fact that the Orders barred patrons *by law* from accessing the Premises, Defendant engages in a tortured exercise in semantics by characterizing the Orders as merely "hindering" or "regulating" access. In an attempt to obfuscate the true nature of the Orders, Defendant points to language that permits restaurants to offer take-out or delivery services and offers that up to this Court as evidence of permitting "access." This argument completely misses the mark. The issue that controls the applicability of coverage under the Civil Authority provision is whether the Orders "prohibit access" to the covered premises, not whether a business continues to operate in some other, limited capacity. *See Narricot*, 2002 WL 31247972 at *4.

Such is the case here. As a result of the Orders, Plaintiff is barred by law from using the Insured Property for its intended purpose, i.e., serving customers on the Premises. Providing a full-service dining experience is the Plaintiff's business. By their very nature, take-out and delivery options constitute services that are provided to patrons *off the premises*. Defendant cannot reasonably claim that an individual who ordered food from a restaurant over the internet and had

it delivered to their door was somehow granted access to that restaurant's premises, but that is the natural extension of Defendant's argument.   However, because the language of the Orders prohibited access to the Premises, restaurants like Plaintiff's may endeavor to do business and generate income in a manner that comports with the law.   To the extent a business does so despite the prohibition of access to its Premises, that is an issue that goes to the amount of business income losses (and Plaintiff's efforts to mitigate), not whether coverage exists under the terms of the Policy.

Defendant's position here is that the civil orders did not prevent access to the property such that the Plaintiff could have continued to operate its restaurant in the face of these order.   That is wrong.   In an attempt to lend support for its position, Defendant lays out, in a footnote, a list of cases where courts found that access was not prohibited and accordingly denied the plaintiffs' applications for civil authority coverage.   However, Defendant does not discuss these cases with any degree of detail or attempt to analogize them to the facts before this Court.   Perhaps that is because reviewing them with even the hint of a critical eye reveals that not one of those courts was faced with a factual scenario such as this one, a once in a century pandemic, where the insured plaintiff was required by law to prohibit the public from accessing its premises.

For example, in *Abner*, the 9/11 terrorist attacks restricted vehicular, but not pedestrian, traffic in the area of plaintiff's investment firm, and access to the premises was not closed to the public by order of law.   308 F. Supp. 2d 331, 333 (S.D.N.Y. 2004).   In *Commstop*, plaintiff's convenience store lost business due to road work in the area that detoured traffic away from the location, but access to the premises was not closed to the public by order of law.   No. 11-1257, 2012 WL 1883461, at *2 (W.D. La. May 17, 2012).   In *Ski Shawnee*, a bridge that served as the primary route of ingress to plaintiff's ski area collapsed, but other routes could reach the location

and access to the premises was not closed to the public by order of law.  No. 3:09-cv-2391, 2010 WL 2696782 (M.D. Pa. July 6, 2010).  In *Kean, Miller*, plaintiff's office closed under its own volition after authorities "encouraged" residents to stay off the streets, but access to the premises was not closed to the public by order of law.  2007 WL 2489711 at *4.  Finally, in *Paradies Shops*, plaintiff operated a series of retail stores in airports that suffered losses after the public was discouraged from flying and some individual airports chose to close, but access to the premises was not closed to the public by order of law.  No. 1:03-CV-3154-JEC, 2004 WL 5704715, at *3 (N.D. Ga. Dec. 15, 2004).

On the other hand, *Narricot*, a case decided by Judge Dalzell and analyzed under Pennsylvania law, is analogous to the facts of this case with respect to the "prohibition of access" element of a civil authority claim.  *Narricot* concerned business income losses suffered by the plaintiff at two of its plants in Tarboro, North Carolina and Boykins, Virginia in September of 1999 as a result of Hurricane Floyd.  Plaintiff brought suit against defendant, Fireman's Fund Insurance Company, claiming coverage under the Civil Authority Clause of the policy.  The Court held that a covered event occurred that prohibited access to the premises, relying on the facts that 1) the Town of Taroboro hand-delivered a letter to each industrial facility in town, including Narricot, prohibiting them from operating, and 2) the County of Southampton, where Boykins is located, ordered Narricot to cease industrial operations and did not allow Narricot to resume them until several days later.  *Narricot* at *1-2.

Based on the foregoing, the Orders constituted a prohibition of access to Plaintiff's Insured Premises, and Defendant's Motion to Dismiss must be denied.

C.     **Plaintiff has Suffered Physical Loss of or Damage to its Property and Nearby Property**

Defendant argues that Plaintiff has not alleged any physical loss or damage to its own or nearby property merely because the FAC does not plead that the property was "physically damaged" or "physically altered" in any way. *See* MTD at 28-31. Such a narrow interpretation of the "physical loss or damage" requirement is contrary to the plain, reasonable, and intended language of the Policy. *See Hughes v. Potomac Ins. Co. of D.C.*, 1999 Cal. App. 2d 239, 248-49 (Ct. App. 1962) ("Despite the fact that a 'dwelling building' might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.").

Neither "direct physical loss" nor "damage" is defined in the Policy,[15] but "physical loss of" is clearly an additional, and different, basis for coverage beyond "damage to" property—and a basis which Defendant almost completely ignores. *See Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1991, 2007 (6th Cir. 1995); *Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*, No CV 17-04908 AB, 2018 WL 3829767, at *3 (C.D. Cal. July 11, 2018); *see also Narricot*, 2002 WL 31247972, at *4 (recognizing that because the phrase "action of civil authority" was not defined in the policy, the words should be construed according to their ordinary English meaning, and any ambiguity "must be resolved in favor of the insured"). Because these phrases are stated in the disjunctive ("or"), they are clearly separate and distinct triggers of

---

[15] "The proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured." *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. 1998). "[A] court's focus upon the insured's 'reasonable expectations' is not limited only to situations in which the insurance contract might be deemed ambiguous . . . ." *Betz v. Erie Ins. Exch.*, 2008 PA Super 221, ¶ 10, 957 A.2d 1244, 1253 (2008). "In any event, where the court finds the policy language to be ambiguous . . . determination of the parties' intent poses a question of fact . . . ." *Id.* at ¶ 11.

coverage. *See Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*, 119 F. Supp. 2d 552, 557 (E.D.N.C. 2000).

Numerous courts nationwide agree that physical loss does not require structural damage, but lost operations or inability to use the business is sufficient. *See, e.g.*, *Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) (finding that unpleasant odor was physical injury to property); *Motorists Mutual Ins. Co. v. Hardinger*, 131 Fed. Appx. 823, 825-27 (3d Cir. 2005) (finding that bacteria contamination of well water would constitute direct physical loss to house if it rendered it unusable); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 2:12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014) (finding the presence of ammonia to constitute physical loss or damage because "property can sustain physical loss or damage without experiencing structural alteration").[16]   In finding coverage, courts have held that the *loss of functionality* is what is covered. *Am. Guarantee & Liab.. Ins. Co. v. Ingram Micro, Inc.*, No. 99-185 TUC ACM, 2000 WL 726789, at *2 (D. Ariz. April 18, 2000) ("'physical damage' is not

---

[16] *See also TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D.Va. 2010) (finding losses due to sulfuric gas released by drywall were covered because "physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces"); *Sullivan v. Std. Fire Ins. Co.*, No. 515, 2007, 2008 WL 361141 (Del. Feb. 11, 2008) (finding mold contamination constituted a physical loss, recognizing "physical" is defined as "having material existence" and mold spores and other bacteria associated with mold undoubtedly have a "material existence" even though they are not tangible or perceptible by the naked eye); *Farmers Ins. Co. of Oregon v. Trutanich*, 858 P.2d 1332, 1336 (Or. 1993) (finding cost of removing odor from methamphetamine lab constituted direct physical loss); *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) (en banc) (finding that gasoline fumes which rendered church building unusable constitute physical loss); *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) (finding asbestos in building made the use of the building dangerous and constituted physical loss of the building and recognizing "direct physical loss" may exist in the absence of structural damage to the insured property because "a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants"); *Matzner v. Seaco Ins. Co*., 9 Mass. L. Rprt. 41 (Mass. Super. 1998) (finding the phrase "direct physical loss or damage" to be ambiguous and holding carbon monoxide contamination in an apartment building was sufficient to render building uninhabitable and was a "direct, physical loss").

restricted to the physical destruction of harm . . . but includes *loss of access, loss of use, and loss of functionality*") (emphasis added).[17]   Further, a condition that renders property unsuitable for its intended use constitutes a direct physical loss, "even where *some utility remains*" constitutes physical loss or damage.  *See Cook v. Allstate Ins. Co.*, No. 48D02-0611-PL-01156 (Indiana Super. 2007); *Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Connecticut*, No. 05-1315-JE, 2007 WL 464715 (D. Or. Feb. 7, 2007) (finding insured suffered "direct physical loss of or damage to" covered property when the property could not be used for its "ordinary expected purpose" even though the property could still be used for other income-generating purposes).  It has even been held that fear of damage can be a direct physical loss.  *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 17 (W.Va. 1998) (finding home rendered unusable by increased risk of rockslide suffered direct physical loss even in the absence of structural damage).

A federal court in Oregon took this analysis one step further after an open-air theater shut down because of ambient wildfire smoke and health concerns over poor air quality.  *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-CV-01932-CL, 2016 WL 3267247 (D. Or. June 7, 2016), *vacated based on a joint stipulated request by the parties,* No. 1:15-CV-019320CL (D. Or. Mar. 6, 2017).  The court noted that air was a physical thing, explaining that "certainly air is not mental or emotional, nor is it theoretical."  Structural damage was not required

---

[17] S*ee also One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015 WL 2226202, at *9 (N.D. Ill. April 22, 2015) ("Where a general all-risk commercial or homeowner's policy insures against both 'loss' and 'damage' to an existing structure, 'physical' damage may take the form of loss of use of otherwise undamaged property, which in turn suffices as a covered loss."); *Dundee Mut. Ins. Co. v. Marifjeren*, 587 N.W.2d 191, 194 (N.D. 1998) (finding coverage in the absence of physical alteration because the properties "no longer performed the function for which they were designed"); *Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 968 A.2d 724 (N.J. App. 2009) (recognizing that since "physical" can mean more than material alteration or damage, "damage" includes loss of function or value, and "physical damage" can include the temporary loss of use due to a power interruption).

for a loss and it was a stretch on the part of the insurer to impute that requirement when it was not in the policy.  *Id.*  The theater had to be cleaned, air filters were replaced repeatedly, and the air quality had to improve before business could resume.  *Id.*  The court held "[e]ven though the loss or damage was not structural or permanent, the property experienced a loss of 'essential functionality.'"  The court went on to find coverage for the loss of business income when the "smoke infiltrated the theater and rendered it "unusable for its intended purpose."

Coverage has also been found where the impairment of function occurred by operation of law.  In *General Mills, Inc. v. Gold Medal Insurance Co.*, 622 N.W. 2d 147, 150 (Minn. Ct. App. 2001), a routine inspection discovered that oats had been treated with a pesticide that was used for other food products and presented no danger to consumers, but technically was not FDA-approved for oats.  The court found coverage for the undamaged oats, holding "[w]hether or not the oats could be safely consumed, they legally could not be used in General Mills' business.  The district court did not err in finding this to be *an impairment of function and value* sufficient to support a finding of physical damage."  *Id.* at 152 (emphasis added).

The Third Circuit caselaw cited by Defendant supports Plaintiff's interpretation of "physical loss" and reiterates that physical loss can occur when a property is uninhabitable or unusable for its intended purpose.  In *Port Auth. Of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002), the court acknowledged there does not have to be actual contamination of property for coverage, so long as a physical cause imminently threatens a property's function or habitability.  Likewise, the Third Circuit's decision in *Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. App'x. 823 (3d Cir. 2005), relies on the *Port Authority* decision and reiterates that property made useless or uninhabitable constitutes a physical loss.  Consequently, the court reversed the

lower court's grant of summary judgment, recognizing that whether there was a physical loss is a genuine issue of material fact. *Id.* at 827.

The remainder of the cases cited by the Defendant are distinguishable and otherwise do not support Defendant's interpretation under the circumstances of the current claims and Policy language. First, *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, No. 90-35654, 1992 WL 16749, at *1 (9th Cir. Jan. 31, 1992), is an asbestos case where the insured sought coverage for the costs of abatement and removal of asbestos, as well as the alleged loss in market value on account of the presence of asbestos, after a tenant rescinded a lease upon discovering asbestos was present. Even after development of a complete record, there is no evidence, however, that asbestos fibers were released into the air, or otherwise became active and dangerous such that they ever rendered the building uninhabitable or unfit for its intended purposes. *Id.* Furthermore, the court found that a pollution exclusion in the policy applied. *Id.* Plaintiff, however, has set forth multiple Oregon cases that make clear that the plain and ordinary meaning of "direct physical loss of or damage to property" does not require structural alteration of property. *See, e.g.*, *Stack Metallurgical Servs*, 2007 WL 464715; *Oregon Shakespeare Festival Ass'n*, 2016 WL 3267247; *Farmers Ins. Co. of Oregon*, 858 P.2d at 1336.

Next, *Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130, 1144-45 (Ohio Ct. App. 2008) interpreted a homeowner's policy offering coverage for a dwellings and structures, as opposed to a business owner's property coverage policy including coverages for lost Business Income, Civil Authority Orders, and other coverages geared toward insuring against business interruptions and losses. The court references a "definition of property damage" in the *Mastellone* homeowner's policy but does not set forth that definition in the opinion. *Id.* Accordingly, we have no way of knowing how the *Mastellone* policy defined "property damage" for purposes of

interpreting "damage to property" under the Policy at issue here.  This is critical because the *Mastellone* court ultimately "construed the term 'physical injury'"—which Defendant concedes in its citation to this case—and not the phrase "physical loss," which is the term at issue in this matter. *See* MTD at 29 n.16 (citing *Mastellone*, 884 N.E.2d at 1144-45).  Further, the *Mastellone* policy had a specific exclusion for mold.  *Mastellone*, 884 N.E.2d at 1144-45.  Thus, the *Mastellone* court's interpretation of the term "physical injury," within the context of an unknown definition of "property damage," in a homeowner's policy, for purposes of evaluating a mold claim, where mold was expressly excluded, cannot be transposed onto different language, under a different Policy, within the context of very different claims.

Neither *Mama Jo's* nor *Universal* are helpful or instructive at this stage of the case or based on these facts involving the presence of a deadly virus on and at the insured's property and premises, and throughout the community, forcing a restaurant to cease serving and permitting customers inside the premises for a lengthy period of time.  In *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018), an insured restaurant business sought coverage for the costs of cleaning dust and debris at the business that accumulated from nearby construction.  The court excluded the insured's experts' opinions that the dust and debris caused physical damage to awnings, the retractable roof, the HVAC system, railings and audio and lighting systems such that they required replacement or repair.  *Id.*  The court held that the restaurant was not "uninhabitable or unusable . . . the restaurant remained open every day . . . and there is no evidence that dust had an impact on the operation other than requiring daily cleaning."  *Id.*  The court concluded that the cost of daily cleaning did not constitute physical loss of or damage to property.  *Id.*  Likewise, in *Universal Image Productions, Inc. v. Chubb Corp.*, 703 F. Supp. 2d 705 (E.D. Mich. 2010), the court granted summary judgment to the insurance

32

company after the record was fully developed and no evidence was presented by plaintiff to support physical loss, other than testimony of an appalling odor.  These cases do not support Defendant's request for dismissal.

While the court in *Newman Myers Kreines Gross Harris P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 328 (S.D.N.Y. 2014), held that a power outage did not constitute physical loss or damage to premises, it recognized that "the critical policy term at issue, requiring 'physical loss or damage,' does not require that the physical loss or damage be tangible, structural or even visible." *Id.*  It went on to distinguish *TRAVCO*, *Essex*, *Hardinger*, and *Murray* (cited above), stating that although they "did not involve tangible, structural damage to the architecture of the premises," the "invisible fumes," "contamination," and "palpable future risk of physical damage" were sufficient in each of these cases to represent a form of physical damage.

The plaintiff in *Roundabout Theatre Co., Inc. v. Cont'l Cas. Co.*, 751 N.Y.S.2d 4, 8 (N.Y. App. Div. 2002), suffered losses due to damage to and the subsequent closure of a street, prohibiting access to the insured's property.  The insured's policy did not provide coverage for business interruption loss resulting from off-site property damage or from the act of any lawfully constituted authority.  *Id.*  The plaintiff in *Roundabout* only alleged physical loss or damage had occurred to adjacent property; consequently, the court held that "losses resulting from off-site property damage do not constitute covered perils under the policy." *Id.*[18]

Finally, *Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280 (S.D.N.Y. 2005) involved only purely economic losses arising from the grounding of airlines after September 11,

---

[18] Of note, the policy at issue in *Roundabout* was limited and did not include Civil Authority coverage that would cover losses resulting in the inaccessibility of the insured's premises due to an order closing a street as a result of damage.  Accordingly, it provides no relevant support to Defendant's motion here.

2001; because the plaintiff's garage was part of Philadelphia International Airport and depended on the airport to attract its customers, the plaintiff's business was interrupted as a result of the groundstop. *Id.* at 283. This is a far cry from the Plaintiff's allegations in this matter—where a viral pandemic has physically affected not only Plaintiff's business and those in the immediate vicinity of Plaintiff's property, but also those throughout the entire Commonwealth of Pennsylvania and the world.[19]

In its FAC, Plaintiff alleges that its insured property was at imminent and continued risk of Coronavirus contamination, if it was not contaminated already. FAC ¶ 59. Defendant's arguments essentially criticize Plaintiff's (and the world's) imperfect knowledge about the presence of COVID-19, but if it were knowable where the virus is, there would not likely be an ongoing pandemic. The nature of the pandemic is such that Plaintiff experienced physical loss as a result of the pandemic and the resulting Civil Authority Orders, regardless of an indisputable assertion that COVID-19 was present in Plaintiff's building, or anywhere, at any given time.

---

[19] Additionally, the Insurance Services Office ("ISO")—the organization responsible for drafting the standardized language in Plaintiff's Policy—has affirmed that a virus can cause physical loss and damage merely by its presence. The ISO's 2006 circular for an Exclusion Regarding Loss Due to Virus or Bacteria reads, in part:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.

> Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

ISO Circular LI-CF-2006-175, New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria, ISO (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

Rather, the allegations in the FAC were based on "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances."  FED. R. CIV. P. 11(b).

As alleged in the FAC, the COVID-19 pandemic has resulted in the "widespread, omnipresent and persistent presence of COVID-19 in and around Plaintiff's Insured Property and adjacent properties."  FAC ¶ 18; *see also Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889-90 (Pa. 2020) (affirming the Pennsylvania governor's authority to declare the entire state a "disaster area" because "COVID-19 cases have now been reported in all counties in the Commonwealth"). Plaintiff's business has been affected by the Civil Authority Orders prohibiting access to its insured property due to the clear evidence of the Coronavirus being present throughout Pennsylvania, and especially in Philadelphia County, and the severe safety risks associated with allowing individuals to come in close contact.  FAC ¶¶ 36-38, 40-42, 57-68.  As stated in the FAC, "[r]estaurants like the Plaintiff's are more susceptible to being or becoming contaminated, as both respiratory droplets and fomites are more likely to be retained on the Insured Property and remain viable for far longer as compared to a facility with open-air ventilation."  FAC ¶ 60.

Regardless, whether Plaintiff did indeed suffer a physical loss or damage caused by a covered cause of loss is a question of fact, not a legal issue to be determined at the motion to dismiss stage.  Because Plaintiff has adequately pleaded allegations supporting coverage, Defendant's motion to dismiss is due to be denied.

### 1.    Defendants two Lead Cases are Inapposite to this Litigation

Defendant's leading argument is that two courts, one in Michigan and one in New York, concluded that "strikingly similar" policies did not cover "such losses."  In fact, the policies and facts presented are significantly different here and those orally-rendered decisions are clearly distinguishable from this case.  In Michigan, the plaintiff conceded it had no property damage.  *Gavrilides Mgmt. Co. v. Michigan Ins. Co.*, No. 20-258-CB (Mich. Cir. Ct., Ingham).  In

New York, the court was addressing a preliminary injunction motion only.  *Social Life Magazine Inc. v. Sentinel Ins. Co. Ltd.*, No. 20-cv-3311 (S.D.N.Y.).  In both cases, the courts cited state laws interpreting *physical damage* as requiring an alteration to the integrity of the property and ignoring the phrase *loss*.  Further, both decisions are not final: the Michigan case is being appealed and the Complaint in the New York case is being amended to add allegations of impact on property.  Thus, this Court should not consider these rulings dispositive at this stage.

### D.        Plaintiff's Claim for Business Income Coverage is Sufficiently Pleaded

In the business income coverage provision of the Policy, Defendant agreed to pay business income losses Plaintiff sustained due to a suspension of operations "caused by direct physical loss of or damage to property . . .  caused by or result from a Covered Cause of Loss" at the Insured Property. Dkt. 29-4 at 57.  The Complaint sufficiently alleges physical loss or damage to its property such that it pleads "enough fact to raise a reasonable expectation that discovery will reveal evidence" of Plaintiff's entitlement to relief under the business income provision of its policy. *Twombly*, 550 U.S. at 545.  As explained in Section C, Plaintiff adequately pleaded physical loss of or damage to the Insured Property.  Further, as explained in Section B, the losses Plaintiff sustained are a Covered Cause of Loss because the losses are not excluded in the Policy.  Also, Defendant mischaracterizes Plaintiff's allegations that it is  "disavow[ing] that Coronavirus was present at its restaurant" (D.E #  29 at 37); rather, Plaintiff merely states that it does not seek a factual determination of whether Coronavirus was present at the Insured Property because such a determination is unnecessary to the declaratory relief Plaintiff seeks.  D.E. # 24-3 at ¶ 76, Prayer for Relief (10).

Rather than being an "afterthought" or 'hypothetical" as Defendant mischaracterizes Plaintiff's business income claim (D.E. # 29 at 36), Plaintiff's well-pleaded Complaint includes numerous allegations establishing Plaintiff has suffered or is threatened with "an actual injury

traceable to the defendant," which is "likely to be redressed by a favorable judicial decision." *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (citations omitted).  Stated differently, the Complaint establishes Plaintiff will suffer actual injury if Defendant refuses to pay under the business income coverage provision when Plaintiff suffered business income losses caused by a Covered Cause of Loss.  Thus, Defendant's motion to dismiss should be denied as to Plaintiff's business income claim.

## V.     CONCLUSION

As set forth herein and in the accompanying documents, for the foregoing reasons, Defendant's Motion to Dismiss should be denied in its entirety.

| | |
|---|---|
| */s/ Richard Golomb*<br>Richard M. Golomb, Esq.<br>Kenneth J. Grunfeld, Esq.<br>**GOLOMB & HONIK, P.C.**<br>1835 Market Street, Suite 2900<br>Philadelphia, PA 19103<br>Telephone: (215) 985-9177<br>Facsimile: (215) 985-4169<br>rgolomb@golombhonik.com<br>kgrunfeld@golombhonik.com | Arnold Levin, Esq.<br>Laurence Berman, Esq.<br>Frederick Longer, Esq.<br>Daniel Levin, Esq.<br>**LEVIN SEDRAN & BERMAN LLP**<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106-3697<br>Telephone: (215) 592-1500<br>Facsimile: (215) 592-4663<br>alevin@lfsblaw.com<br>flonger@lfsblaw.com<br>dlevin@lfsblaw.com |
| W. Daniel "Dee" Miles, III<br>Rachel N. Boyd<br>Paul W. Evans<br>**BEASLEY,     ALLEN,     CROW,<br>METHVIN, PORTIS & MILES, P.C.**<br>P.O. Box 4160<br>Montgomery, AL 36103<br>Telephone: (334) 269-2343<br>Facsimile: (334) 954-7555<br>dee.miles@beasleyallen.com<br>rachel.boyd@beasleyallen.com<br>paul.evans@beasleyallen.com | Dated: July 27, 2020<br><br>*Counsel for Plaintiff* |

## <u>CERTIFICATE OF SERVICE</u>

I, Richard M. Golomb, Esquire, certifies that on this date, the foregoing was filed and served via the Court's CM/ECF Filing System.


Date: <u>July 27, 2020</u>                          <u>*/s/ Richard M. Golomb*          </u>
                                                Richard M. Golomb, ESQUIRE