**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NEWCHOPS RESTAURANT COMCAST** | : | **CIVIL ACTION** |
| **LLC d/b/a CHOPS** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ADMIRAL INDEMNITY COMPANY** | : | **NO. 20-1949** |

| | | |
|---|---|---|
| **LH DINING L.L.C. d/b/a** | : | **CIVIL ACTION** |
| **River Twice Restaurant** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ADMIRAL INDEMNITY COMPANY** | : | **NO. 20-1869** |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                   **December 17, 2020**

Like many restaurants in Philadelphia and Pennsylvania, plaintiffs Newchops Restaurant Comcast LLC and LH Dining L.L.C. were forced to close or severely limit operations in March 2020 due to the shutdown orders issued by the Governor of Pennsylvania and the Mayor of Philadelphia in response to the COVID-19 pandemic. As a result, they suffered business losses and sought indemnity from their insurance carrier, Admiral Indemnity Company, under their commercial lines policies. Admiral denied the claims.

Newchops and LH Dining ("insureds") then brought these actions seeking a declaration that Admiral must cover the business losses resulting from the mandatory closing of their restaurants pursuant to the shutdown orders.[1] The insureds claim that their business losses are covered under the civil authority and business income

---

[1] The insureds bring two separate actions, but the defendant, the insurance policies, the factual allegations and the arguments are identical. We shall refer to the policies in the singular.

1

provisions of their policies. Admiral argues that the insureds have not alleged facts establishing coverage under either provision. If they did, their claims are barred by the virus exclusion.

We conclude that the alleged facts establish that their losses are not covered. Even if they were, the virus exclusion bars coverage. Therefore, we shall grant Admiral's motions to dismiss.

## Factual Background

Newchops owns and operates Chops, a steakhouse located in Center City Philadelphia,[2] and LH Dining operates River Twice Restaurant in South Philadelphia.[3] The insureds each served hundreds of customers weekly in outdoor and indoor dining spaces.[4]

In September 2019, Admiral issued commercial lines policies to the insureds, providing property, business personal property, business income, extra expenses and other coverage through September 2020.[5] They are "all risks" policies.

On March 16, 2020, in response to the rapidly worsening COVID-19 pandemic, the City of Philadelphia ordered the closure of all non-essential businesses (the "Philadelphia Order").[6] The Philadelphia Order mandated that "[f]ood establishments may only accommodate online and phone orders for delivery and pick-up, and cannot allow dine-

---

[2] Pl.'s Am. Compl. at ¶ 12 (Case No. 20-1949, ECF No. 27) ("Newchops Am. Compl.").

[3] Pl.'s Am. Compl. at ¶ 12 (Case No. 20-1869, ECF No. 27) ("LH Dining Am. Compl.").

[4] Newchops Am. Compl. at ¶¶ 12, 62; LH Dining Am. Compl. at ¶¶ 12, 63.

[5] Newchops Am. Compl. at ¶¶ 11, 13-14, 17; LH Dining Am. Compl. at ¶¶ 11, 13-14, 17.

[6] Newchops Am. Compl. at ¶ 47; LH Dining Am. Compl. at ¶ 47.

in service, for the duration of these restrictions."[7] Three days later, Pennsylvania Governor Tom Wolf issued an order requiring all "non-life-sustaining businesses" across the Commonwealth to cease operations and close all physical locations (the "Pennsylvania Order").[8] The Pennsylvania Order noted that "[a]ll restaurants and bars previously have been ordered to close their dine-in facilities" and ordered that "[b]usinesses that offer carry-out, delivery, and drive-through and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons."[9]

Complying with the shutdown orders, the insureds closed their restaurants on March 16, 2020.[10] Newchops laid off twenty-five employees.[11] LH Dining furloughed eight.[12]

The insureds each filed an action seeking a declaration that its business losses were covered.[13] Admiral answered the complaints and filed a motion for judgment on the

---

[7] "City Announces New Restrictions on Business Activity in Philadelphia," City of Philadelphia (March 16, 2020), https://www.phila.gov/2020-03-16-city-announces-new-restrictions-on-business-activity-in-philadelphia/ (the "Philadelphia Order"); Newchops Am. Compl. at ¶ 47 (citing the Philadelphia Order); LH Dining Am. Compl. at ¶ 47 (citing the Philadelphia Order).

[8] Newchops Am. Compl. at ¶ 48; LH Dining Am. Compl. at ¶ 48.

[9] Id.; Def.'s Mot. to Dism. Ex. 2 (Case No. 20-1949, ECF No. 29) ("Newchops Mot. to Dism."); Def.'s Mot. to Dism. Ex. 2 (Case No. 20-1869, ECF No. 29) ("LH Dining Mot. to Dism.").

[10] Newchops Am. Compl. at ¶ 57; LH Dining Am. Compl. at ¶ 58.

[11] Newchops Am. Compl. at ¶ 58.

[12] LH Dining Am. Compl. at ¶ 59.

[13] Pl.'s Compl. (Case No. 20-1869, ECF No. 1); Pl.'s Compl. (Case No. 20-1949, ECF No. 1).

pleadings in each.[14] In response to the motions, the insureds filed amended complaints on June 29, 2020.[15] Admiral responded with motions to dismiss.[16]

### Interpreting Insurance Contracts

The interpretation of an insurance contract is a question of law. *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011). A court must interpret the plain language of the insurance contract read in its entirety, giving effect to all its provisions. *Id.* (citation omitted); *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 258 (3d Cir. 2019) (quoting *Mut. of Omaha Ins. Co. v. Bosses*, 237 A.2d 218, 220 (Pa. 1968)); *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987) (quoting 13 Appleman, *Insurance Law and Practice,* § 7383 at 34-37 (1976)). The words in the policy are construed by their "natural, plain and ordinary sense" meaning. *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997) (citing *Easton v. Wash. Cty. Ins. Co.,* 137 A.2d 332, 335 (Pa. 1958)).

When the policy language is ambiguous, the provision is construed in favor of the insured. *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 677 (3d Cir. 2016) (quoting *Med. Protective Co. v. Watkins,* 198 F.3d 100, 104 (3d Cir. 1999)); *Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014) (quoting *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)). The policy is ambiguous where it is reasonably susceptible of more than one construction and meaning. *Pa. Nat'l*, 106 A.3d at 14 (citing *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 978 (Pa. 2001)). However, policy language

---

[14] Def.'s Answer (Case No. 20-1949, ECF No. 13); Def's Mot. for J. on the Plead. (Case No. 20-1949, ECF No. 17); Def.'s Answer (Case No. 20-1869, ECF No. 14); Def.'s Mot. for J. on Plead. (Case No. 20-1869, ECF No. 18).

[15] Newchops Am. Compl.; LH Dining Am. Compl.

[16] Newchops Mot. to Dism.; LH Dining Mot. to Dism.

may not be stretched beyond its plain meaning to create an ambiguity. *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011) (citing *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)); *Trizechahn Gateway LLC v. Titus,* 976 A.2d 474, 483 (Pa. 2009) (citation omitted). It is not ambiguous merely because the parties disagree about its meaning. *Meyer*, 648 F.3d at 164 (citing *Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881, 885 (Pa. Super. 2000)).

The guiding principle in interpreting an insurance contract is to effectuate the reasonable expectations of the insured. *Reliance Ins. Co. v. Moessner,* 121 F.3d 895, 903 (3d Cir. 1997) (citations omitted); *Safe Auto Ins. Co. v. Berlin,* 991 A.2d 327, 331 (Pa. Super. 2010) (citation omitted). Under Pennsylvania law, even if the terms of the insurance contract are clear and unambiguous, the insured's reasonable expectations may prevail over the express terms of the contract. *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.,* 38 F.3d 1303, 1309 (3d Cir. 1994); *see also Safe Auto Ins. Co.,* 991 A.2d at 332 ("[A] court's decision to look beyond the policy language is not erroneous under all circumstances.") (citation omitted). Nonetheless, the language of the insurance contract itself serves as the best evidence of the parties' reasonable expectations. *Safe Auto Ins. Co.,* 991 A.2d at 332 (quoting *Allstate Ins. Co. v. McGovern,* No. 07–2486, 2008 WL 2120722, at *2 (E.D. Pa. May 20, 2008)). At times, the Pennsylvania Superior Court has ruled out reasonable expectations when the insurance contract is clear and unambiguous. *See Regis Ins. Co. v. All Am. Rathskeller, Inc.,* 976 A.2d 1157, 1166 n.11 (Pa. Super. 2009) ("However, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous.") (citations and

quotations omitted); *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.,* 941 A.2d 706, 717 (Pa. Super. 2007).

The insured has the initial burden of establishing coverage under the policy. *State Farm Fire & Cas. Co. v. Estate of Mehlman,* 589 F.3d 105, 111 (3d Cir. 2009) (citing *Koppers Co. v. Aetna Cas. and Sur. Co.,* 98 F.3d 1440, 1446 (3d Cir. 1996)). Where the insured meets that burden and the insurer relies on a policy exclusion as the basis for denying coverage, the insurer then has the burden of proving that the exclusion applies. *Id.; Wolfe v. Ross*, 115 A.3d 880, 884 (Pa. Super. 2015) (citing *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)). Policy exclusions are strictly construed against the insurer. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206-7 (3d Cir. 2001) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998)); *Peters v. Nat'l Interstate Ins. Co.*, 108 A.3d 38, 43 (Pa. Super. 2014) (quoting *Swarner v. Mut. Benefit Grp.*, 72 A.3d 641, 644-45 (Pa. Super. 2013)).

## Analysis

The insureds assert coverage under the civil authority and the business income provisions of the policy.[17] Admiral contends that there is no covered loss under either provision.[18] It also relies on the virus exclusion as a basis for denying coverage.[19] Pointing out that the virus exclusion expressly applies to both the civil authority and business income provisions, Admiral asserts that the exclusion bars coverage.[20]

---

[17] Newchops Am. Compl. at ¶ 73, Section VI(10); LH Dining Am. Compl. at ¶ 74, Section VI(10); Pl.'s Resp. at 20, 36-37 (Case No. 20-1949, ECF No. 30) ("Newchops Resp."); Pl.'s Resp. at 20, 36-37 (Case No. 20-1869, ECF No. 30) ("LH Dining Resp.").

[18] Newchops Mot. to Dism. at 23-32; LH Dining Mot. to Dism. at 23-32.

[19] Newchops Mot. to Dism. at 18; LH Dining Mot. to Dism. at 18.

[20] Newchops Mot. to Dism. at 18, 21; LH Dining Mot. to Dism. at 18, 21.

Under Pennsylvania law, we first determine whether the insureds have met their burden of establishing coverage under either the civil authority or the business income provision before considering whether the virus exclusion applies. *See State Farm,* 589 F.3d at 111 (citations omitted); *Wolfe*, 115 A.3d at 884 (citations omitted).

The civil authority provision states in relevant part:

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1)  Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2)  The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.[21]

The business income coverage provides in relevant part:

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.[22]

---

[21] Newchops Policy at BI-2 § A.5.a ("Newchops Policy"); LH Dining Policy at BI-2 § A.5.a ("LH Dining Policy").

[22] Newchops Policy at BI-1 § A.1; LH Dining Policy at BI-1 § A.1.

The civil authority provision applies when a civil authority issues an order prohibiting access[23] to the insured's property in response to a dangerous physical condition caused by damage to another's property. The business income provision is triggered when there is a suspension of the insureds' operations caused by direct physical loss of or damage to the insured's property.

Both coverages share two essential elements. Each is predicated on damage to property. The civil authority coverage requires "damage to property" of another, and the business income provision covers "direct physical loss of or damage to property" of the insured.

Each also depends on the existence of a "covered cause of loss" as defined in the policy. The civil authority coverage applies only when the damage to another's property that instigated the governmental response was caused by a "covered cause of loss." Similarly, the business income coverage applies when operations are suspended as a result of loss or damage caused by a "covered cause of loss."

The parties do not disagree that the facts state that the shutdown orders were "civil authority actions" within the meaning of the policy. Nor do they dispute that the allegations show there was a "suspension of operations" as a result of these actions. The dispute is whether the insureds have alleged loss of or damage to property caused by a covered

---

[23] Admiral argues that because the orders permitted partial use of the properties, access was not prohibited. The shutdown orders prohibited access to the insured properties. It does not matter whether the prohibition was total or partial. Nothing in the policy requires total inaccessibility. The restaurants were essentially closed to the public, prohibiting the insureds from conducting their usual business. Because it is unclear whether access need be total or substantially prohibited, the policy language is ambiguous. Accordingly, because we must construe the ambiguity in favor of the insureds, we conclude that any restriction of access, total or partial, to the properties satisfies the prohibited access element of the civil authority provision.

cause of loss. Thus, we start with what constitutes loss of or damage to property and then examine the policy definition of a covered cause of loss.

*Loss of or Damage to Property*

The civil authority provision applies when damage to another's property created a dangerous condition resulting in the government restricting access to the insured property. The business income coverage applies when business losses are caused by "direct physical loss of or damage to" the insured property.

The issue here is whether the loss or damage must be physical or structural, not merely economic. Admiral contends that the insureds must allege some distinct, demonstrable, physical alteration of the insured properties or nearby properties to satisfy the "damage to property" requirement.[24] It argues that the policy covers only tangible, physical damage, such as a structural change, not economic damage.[25] Citing the "physical loss of or damage to property" language appearing only in the business income provision, the insureds counter that a loss of functionality, usability or habitability is sufficient.[26]

Property damage is "a distinct, demonstrable, physical alteration of the property." 10A *Couch on Ins.* § 148.46 (3d ed. 1995) (citations omitted). Pure economic losses are intangible and do not constitute property damage. 9A *Couch on Ins.* § 129.7.

---

[24] Newchops Mot. to Dism. at 28-30; LH Dining Mot. to Dism. at 28-30.

[25] Newchops Mot. to Dism. at 29; LH Dining Mot. to Dism. at 29.

[26] The insureds do not address the "damage to property" language from the civil authority provision.

Reading the civil authority and business income provisions in the context of the entire policy, we conclude that the damage must be physical.[27] The civil authority provision specifically refers to "dangerous physical conditions resulting from the damage or a continuation of the Covered Cause of Loss that caused the damage." The instigation of the orders prohibiting access must be a physical condition in a nearby property. Loss of utility is not structural or physical. Nor is the mere possibility of the presence of the virus in the nearby properties.

The business income provision covers losses sustained by the suspension of operations during the "period of restoration." This term is given special meaning in the policy. It is defined as ending "when the property . . . should be repaired, rebuilt or replaced."[28] This definition informs that the loss or damage to the property must be physical, affecting the structure of the property. It speaks to the time to "repair, rebuild or replace" the property, terms connoting structure. *See Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) (finding the restoration language "strongly suggest[s] that the damage contemplated by the Policy is physical in nature" under Pennsylvania law).

---

[27] This conclusion is consistent with the opinions of numerous other courts presented with the same issue in the COVID-19 business interruption insurance context. *See, e.g.*, *Kessler v. Dentists' Ins. Co.*, No. 20-3376, 2020 WL 7181057, at *5 (E.D. Pa. Dec. 7, 2020); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893, at *3 (E.D. Pa. Nov. 6, 2020); *Real Hosp. LLC v. Travelers Cas. Ins. Co.*, No. 20-87, 2020 WL 6503405, at *5-6 (S.D. Miss. Nov. 4, 2020); *Uncork and Create LLC. v. Cincinnati Ins. Co.,* No. 20-00401, 2020 WL 6436948, at *4-5 (S.D. W.Va. Nov. 2, 2020); *Hillcrest Optical, Inc. v. Cont'l Cas. Co.*, No. 20-275, 2020 WL 6163142, at *6-7 (S.D. Ala. Oct. 21, 2020); *Seifert v. IMT Ins. Co.*, No. 20-1102, 2020 WL 6120002, *3-4 (D. Minn. Oct. 16, 2020); *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 20-2160, 2020 WL 5630465, at *2 (N.D. Ill. Sept. 21, 2020); *Turek Enters v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484, *6-7 (E.D. Mich. Sept. 3, 2020); *10E, LLC v. Travelers Indem. Co. of Conn.,* No. 20-4418, 2020 WL 5359653, at *4 (C.D. Cal. Sept. 2, 2020); *Malaube, LLC v. Greenwich Insurance Co.*, No. 20-22615, 2020 WL 5051581, at *7 (S.D. Fla. Aug. 26, 2020); *Diesel Barbershop, LLC v. State Farm Lloyds*, No. 20-461, 2020 WL 4724305, at *5 (W.D. Tex. Aug. 13, 2020).

[28] Newchops Policy at BI-11 § F.3.b(1); LH Dining Policy at BI-11 § F.3.b(1).

There was no physical damage to the insureds or others' properties alleged in the amended complaints. Thus, because they have not alleged facts showing damage to others' properties or "a direct physical loss of or damage to" their own properties, the insureds have not established coverage under the civil authority or the business income provisions.

*Covered Cause of Loss*

As in typical "all risks" policies, the policy here defines a covered cause of loss as a risk of "direct physical loss" unless the loss is excluded or limited.[29] The insureds argue that the shutdown orders are the covered cause of loss that caused their business losses.[30] However, the shutdown orders cannot constitute a covered cause of loss under either the civil authority or business income provision.

To trigger coverage under the civil authority provision, a covered cause of loss must cause damage to another's property, prompting a civil authority action to respond to that damage. The insureds do not allege damage to nearby properties or to their own properties that was the result of a covered loss. The shutdown orders and accompanying

_____

[29] Newchops Mot. to Dism. Ex. 3 at COL-1 § A ("Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is: (1) Excluded in Section B., Exclusions; or (2) Limited in Section C., Limitations; that follow"); LH Dining Mot. to Dism. Ex. 3 at COL-1 § A (same).

[30] Newchops Am. Compl. at ¶ 33; Newchops Resp. at 13-14; LH Dining Am. Compl. at ¶ 33; LH Dining Resp. at 13-14.
  The insureds offer contradictory causes of the closing of their restaurants. In the amended complaints, the insureds admit they shut their doors "*[i]n light of the Coronavirus global pandemic* and state and local orders mandating that restaurants not permit in-store dining[.]" Newchops Am. Compl. at ¶ 2 (emphasis added); LH Dining Am. Compl. at ¶ 2 (emphasis added). The insureds claim in their briefing that "the losses *caused by COVID-19* and the risk of injury constitute a covered cause of loss under the terms of the Policy" and "Plaintiff experienced physical loss *as a result of the pandemic* and the resulting Civil Authority Orders." Newchops Resp. at 20, 34 (emphasis added); LH Dining Resp. at 20, 34 (emphasis added). They also claim that COVID-19 caused damage to property through virus contamination when rebutting Admiral's arguments about the third element of civil authority coverage. Newchops Resp. at 34; LH Dining Resp. at 34. On one hand, they argue that COVID-19 is not the cause of the damage or their losses when considering whether the virus exclusion applies. On the other hand, it is the cause when trying to establish coverage under the civil authority provision. As we shall see, neither cause is covered. *See infra* at 16.

proclamations were in response to the COVID-19 health crisis, not damage to any property – the insureds' or another's. *See, e.g.,* "Proclamation of Disaster Emergency," Governor Wolf, Commonwealth of Pennsylvania (March 6, 2020) (stating that it is critical "to implement measures to mitigate the spread of COVID-19");[31] "Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of 2019 Novel Coronavirus (COVID-19): Order No. 2," Office of the Mayor: Department of Public Health, City of Philadelphia (March 22, 2020) ("[I]n order to limit the spread of COVID-19, it is immediately necessary to forbid the operations of businesses that do not provide essential services to the public and activities that endanger public health");[32] Philadelphia Order (stating that certain business closures were required "to reduce the spread of the COVID-19 novel coronavirus in Philadelphia"); Pennsylvania Order ("All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19"). The insureds assert as much in their amended complaints.[33] The civil authority action cannot be both the cause of that damage and the response to it.

*Governmental Order Exclusion*

The policy's definition of "covered cause of loss" as it applies to both the civil authority and business income provisions contains an exclusion for governmental orders. The "Causes of Loss – Special Form" specifically states that a government order, like the

---

[31] *See* Newchops Am. Compl. Ex. 2 at 1.

[32] *See* Newchops Am. Compl. Ex. 3.

[33] *See* Newchops Am. Compl. at ¶¶ 33 ("Plaintiff's losses were caused by the entry of Civil Authority Orders, particularly those by Governor Wolf and by the Pennsylvania Department of Health, *to mitigate the spread of COVID-19*"), 46 (Governor Wolf's March 6 Order was "the first formal recognition of an emergency situation in the Commonwealth *as a result of COVID-19*"); LH Dining Am. Compl. at ¶¶ 33, 46 (same).

shutdown orders, is not a "covered cause of loss." The form reads, "[w]e will not pay for loss or damage caused directly or indirectly by . . . [t]he enforcement of any ordinance or law . . . [r]egulating the construction, *use* or repair of any property."[34] As that unequivocal language states, Admiral will not pay for any loss or damage caused by a law that regulated the use of any property. That is what happened here. The shutdown orders were governmental orders regulating the use of property and having the force of law.

According to the Pennsylvania State Police, the shutdown orders "can be enforced by local law enforcement as well as state police. While voluntary compliance is preferred, law enforcement maintains discretion to warn or cite individuals who fail to abide by the orders, and each decision is based on the unique circumstances of an encounter." *See* "Business Closure, Stay at Home Order, Worker Safety Measures, and Liquor Control Enforcement," Pennsylvania State Police (2020), https://www.psp.pa.gov/ COVID-19/Pages/Enforcement.aspx. According to the enforcement guidance, "[t]he closures are enforceable through criminal penalties, under the Disease Control and Prevention Law of 1955 and the Administrative Code of 1929." The Administrative Code, 71 P.S. § 1409, proscribes criminal penalties of a fine or 30 days in county jail. *See* "Business Closure Order Enforcement Guidance," Pennsylvania State Police (2020), https://www.psp.pa.gov/Documents/Public%20Documents/Letter%20LEO%20Community.pdf. Certain provisions under the Crimes Code, including 18 Pa. C.S. § 5101, may be applicable for more serious violations. *Id.*

In his guidance to the restaurant industry, Governor Wolf warned that "[f]ailure to strictly adhere to the requirements of this guidance may result in disciplinary actions up

---

[34] Newchops Policy COL-1 § B.1.a(1) (emphasis added); LH Dining Policy COL-1 § B.1.a(1) (emphasis added).

to and including suspension of licensure, including liquor licenses." "Guidance for Businesses in the Restaurant Industry Permitted to Operate During the COVID-19 Disaster Emergency to Ensure the Safety and Health of Employees and the Public," Governor Tom Wolf (May 27, 2020), https://www.governor.pa.gov/covid-19/restaurant-industry-guidance/. According to the guidance, restaurants that do not complete the self-certification process must operate at no greater than 25% indoor capacity. *Id*. It warned that if a restaurant did not self-certify and exceeded 25% indoor capacity by October 5, 2020, the state enforcement agencies may impose penalties. *Id*.

The Mayor similarly imposed restrictions on indoor and outdoor dining, including that "[b]usinesses must obtain any permits or other authorization, as required, to serve food and beverages outside of physical indoor service areas." "Reopening Guidance: Restaurants and Mobile Food Vendors," Office of the Mayor: Department of Public Health, City of Philadelphia at 1 (October 20, 2020), https://www.phila.gov/media/202005291304 22/Guidelines-for-Restaurants-Mobile-Food-Vendors.pdf. The Mayor's guidance specifically provided that restaurants must follow the requirements outlined in Governor Wolf's guidance to the restaurant industry. *Id*.

As a result of the shutdown orders, the insureds were unable to use their restaurants as intended without violating the law. Thus, the shutdown orders regulating the use of the insureds' properties are not a covered cause of loss under either the civil authority or business income provision.

*Virus Exclusion*

Even if the insureds had suffered covered losses under either or both the civil authority and business income provisions, the virus exclusion precludes coverage. The

14

policy contains an exclusion for viruses and other pathogens. The virus exclusion provides "[w]e will not pay for loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease."[35]

Lest there be any ambiguity, the virus exclusion explicitly states that it "applies to all coverage under all forms and endorsements . . . including . . . business income . . . or action of civil authority."[36] This reference to civil authority coverage contemplates a civil authority action taken in response to a virus and excludes it from coverage. Similarly, the specific application of the virus exclusion to business income coverage shows that the parties had agreed that a suspension of an insured's operations caused by a virus was not covered.

In an attempt to circumvent this exclusion, the insureds argue that the cause of their losses and damages is the shutdown orders, not the COVID-19 virus.[37] This effort fails.

The civil authority provision applies only when another's property is damaged by a covered cause of loss. As alleged in the amended complaints, the virus contaminated other properties which caused the civil authorities to issue the orders. If so, the cause of the insureds' losses was the virus, which is specifically excluded as a covered cause of loss. Even if the shutdown orders were the cause, they are similarly excluded from the

---

[35] Newchops Policy at CP 01 40 07 06 § B; LH Dining Policy at CP 01 40 07 06 § B.

[36] Newchops Policy at CP 01 40 07 06 § A; LH Dining Policy at CP 01 40 07 06 § A.

[37] *See supra* note 30.

definition of covered cause of loss. Thus, whether the cause of the losses was the shutdown orders or the virus, it was not covered.

The business income provision requires loss of or damage to the insured's property caused by a covered cause of loss. The insureds do not claim that the virus contaminated their properties. Nor do they allege any damage to their properties that caused them to suspend operations. If they did, the virus exclusion would bar coverage.

The insureds argue that the virus exclusion is ambiguous because it does not include a specific reference to a pandemic. The 2006 Insurance Services Office ("ISO") filing cited in the amended complaints reveals why insurers sought the virus exclusion.[38] The ISO filing clearly contemplated a pandemic as a potential source of loss and created the virus exclusion language to foreclose that avenue of recovery. The filing reads:

> While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, *the specter of pandemic* or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.[39]

The lack of a specific reference to a pandemic in the policy does not render the provision ambiguous. *See Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893, at *4 (E.D. Pa. Nov. 6, 2020) ("the virus exclusion unambiguously bars coverage for plaintiff's claims due to COVID-19"). *See also Diesel Barbershop, LLC v. State Farm Lloyds*, No. 20-461, 2020 WL 4724305, at *6 (W.D. Tex. Aug. 13, 2020)

---

[38] Although extrinsic evidence cannot be considered if the contract terms are unambiguous, *see Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015), the ISO filing is relevant to the insureds' regulatory estoppel argument and further underscores Admiral's point that the virus exclusion applies here.

[39] Newchops Mot. to Dism. Ex. 6 at 6 (emphasis added); LH Dining Mot. to Dism. Ex. 6 at 6 (emphasis added).

(citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 210 (5th Cir. 2007)) ("[W]hile the Virus Exclusion could have been even more specifically worded, that alone does not make the exclusion 'ambiguous.'"). In any event, there is no real distinction between "virus" and "coronavirus pandemic."

The insureds argue that the virus exclusion was first permitted by state insurance departments "due to misleading and fraudulent statements by the ISO that property insurance policies do not and were not intended to cover losses caused by viruses."[40] The insureds maintain that "before the ISO made such baseless assertions, courts considered contamination by a virus to be physical damage."[41] Without relying on any facts, the insureds seek additional discovery on this issue under a theory of regulatory estoppel.

"[U]nder Pennsylvania's doctrine of regulatory estoppel, an industry that makes representations to a regulatory agency to win agency approval 'will not be heard to assert the opposite position when claims are made by [litigants such as] insured policyholders.'" *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207, 211 (3d Cir. 2010) (quoting *Sunbeam Corp. v. Liberty Mut. Ins. Co.,* 781 A.2d 1189, 1192-93 (Pa. 2001)). To establish regulatory estoppel under Pennsylvania law, the party seeking to invoke it must establish that the opposing party made a statement to a regulatory agency and later adopted a position contrary to the one presented to the regulatory agency. *Simon Wrecking Co. v. AIU Ins. Co.*, 541 F. Supp. 2d 714, 717 (E.D. Pa. 2008).

---

[40] Newchops Am. Compl. at 34; LH Dining Am. Compl. at 34.

[41] *Id.*

Even assuming that ISO's statements can be imputed to Admiral,[42] the insureds have not alleged that Admiral is now contradicting those statements. On the contrary, Admiral's position here is consistent with the ISO's statement. The ISO's filing asserted in relevant part:

> **Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage.** An allegation of property damage may be a point of disagreement in a particular case. . . . While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, **the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.** In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.[43]

The ISO recognized that not every case alleging loss due to virus or bacteria involves property damage and that a virus exclusion can be helpful in clarifying that a policy does not cover losses stemming from a virus or other disease-causing agent. Even if ISO's statement was fraudulent or misleading, the insureds have not identified how Admiral's position contradicts ISO's earlier statements. *See Handel*, 2020 WL 6545893, at *5 ("Defendant takes the same position here as the ISO and AAIS did by arguing that

---

[42] Admiral suggests in passing that the ISO's statements to regulators do not bind it, but it does not directly argue this point. *See* Def.'s Reply in Supp. of Mot. to Dism. at 7 (Case No. 20-1949, ECF No. 31) ("Newchops Reply") ("Even assuming that ISO's actions in 2006 could bind Admiral. . . ."); Def.'s Reply in Supp. of Mot. to Dism. at 7 (Case No. 20-1869, ECF No. 31) ("LH Dining Reply") (same). The insureds do not explain how the ISO's statements to Pennsylvania insurance regulators bind Admiral.

In *Hussey*, the plaintiff claimed that the defendant was asserting a position contrary to statements made to the Pennsylvania Insurance Department by the ISO on behalf of insurance companies like the defendant. 391 F. App'x at 211. The Court rejected the plaintiff's regulatory estoppel argument, but not because of an issue with the ability of the ISO's statements to bind the defendant. Rather, the Court held that regulatory estoppel did not apply because the statements were not relevant to the contract language at issue in the case, and the context of the statements showed the defendant's position was consistent with the ISO's representations. *Id.*

[43] Newchops Reply Ex. 6 at 2 (emphasis added); LH Dining Reply Ex. 6 at 2 (emphasis added).

the virus exclusion eliminates coverage for any damage or loss as a result of the causes enumerated therein. Since defendant does not take a contradictory position to the one made to regulatory agencies, the doctrine of regulatory estoppel does not apply to this action."); *Kessler v. Dentists' Ins. Co.,* No. 20-3376, 2020 WL 7181057, at *3 (E.D. Pa. Dec. 7, 2020). Therefore, the insureds have not stated a claim for regulatory estoppel.

## Conclusion

The insureds have not stated a claim for coverage under the civil authority or the business income provisions. They have not alleged losses caused by a "covered cause of loss." Even if the insureds had met their burden of establishing coverage under either or both of these provisions, the virus exclusion precludes coverage. Therefore, we shall grant the motions to dismiss with prejudice.[44]

---

[44] We shall not grant leave to amend because the insureds have already amended their complaints, the language of the policy is clear and further amendment would be futile.